Jennifer K. HARBURY, Appellant,

v.

John M. DEUTCH, et al., Appellees.

No. 99–5307.

. United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 8, 2000.

Decided Dec. 12, 2000.

As Amended Dec. 12, 2000.

Jodie L. Kelley argued the cause for appellant. With her on the briefs were Paul Hoffman, Beth Stephens and Jennifer M. Green. Maureen F. Del Duca entered an appearance.

R. Craig Lawrence, Assistant U.S. Attorney, argued the cause for appellees. With him on the brief was Wilma A. Lewis, U.S. Attorney.

Before: EDWARDS, Chief Judge, GINSBURG and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

Jennifer Harbury claims that for about one and a half years in the early 1990s, Central Intelligence Agency officials participated in the torture and murder of her husband, a Guatemalan citizen. She also claims that while he was being tortured and for more than a year and a half after his death, State Department and National Security Council officials systematically concealed information from her and misled her about her husband's fate. Seeking, among other things, damages under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), she filed suit in federal court, claiming deprivation of her husband's Fifth Amendment due process rights, violation of her right to familial association, and interference with her right of "access to courts." The district court dismissed these actions, finding that Harbury had failed to allege the deprivation of any actual constitutional rights, and that even if she had, defendants were entitled to qualified immunity. We agree with the district court as to Harbury's Fifth Amendment and familial association claims. But because we find that she has stated a valid claim for deprivation of her right of access to courts, and because the NSC and State Department officials are not entitled to qualified immunity on this claim, we reverse and remand for further proceedings.

## I

■ Since this appeal comes here on a motion to dismiss, we accept the facts as alleged in the complaint. *See Moore v. Valder,* 65 F.3d 189, 192 (D.C.Cir.1995). Emphasizing that defendants have not yet answered Harbury's charges and that her claims have been subject to neither discovery nor cross-examination, we set out the facts as she pleads them, borrowing liberally from her complaint.

In 1991, Harbury, an American citizen, married Efrain Bamaca–Velasquez, a Guatemalan citizen and high-ranking member of the Guatemalan National Revolutionary Union, a Guatemalan rebel organization. Several months after their Texas wedding, Bamaca returned to Guatemala where, on or around March 12, 1992, he disappeared. The Guatemalan army reported that during a skirmish with its troops, Bamaca committed suicide and was buried nearby. This was false. In fact, Bamaca had been captured and secretly detained by members of the Guatemalan military, including, Harbury alleges, CIA "assets"—members of Guatemalan Security Forces or Intelligence Services paid by the CIA to obtain information about the Guatemalan resistance.

According to the complaint, over the next twelve to eighteen months, Bamaca's captors psychologically abused and physically tortured him. They chained and bound him naked to a bed, beat and threatened him, and encased him in a full-body cast to prevent escape. Eventually, probably some time around September of 1993, they executed him.

About a year after Bamaca disappeared, in early 1993, Harbury learned from a prisoner who had escaped from a Guatemalan interrogation camp that her husband was alive and being tortured. Harbury immediately contacted several State Department officials, reported what she had learned, and asked for information about her husband's status. Although officials to whom she spoke promised to look into the matter, they never provided her with any information.

In August 1993, Harbury obtained permission to open Bamaca's grave. Discovering that the body there was not his, she immediately informed Marilyn McAfee, the U.S. Ambassador to Guatemala. Although the Ambassador told Harbury that she would investigate the matter and report her findings, she too never provided Harbury with any information.

Over the next year, from October 1993 to October 1994, Harbury met repeatedly with State Department officials. Saying

they were concerned about Bamaca's situation, these officials reassured her they were seriously looking into the matter and told her the Guatemalan Military had informed them that it did not have (and had never had) custody of Bamaca.

In October of 1994, the CBS news program 60 Minutes reported that the U.S. Embassy in Guatemala had an intelligence report confirming that Bamaca had been captured alive. In response, the State Department publicly confirmed Bamaca's capture, stating that he had been lightly but not seriously wounded and held prisoner for some time. The State Department also reported that it had no information confirming that Bamaca was still alive.

In the wake of the 60 Minutes report and the State Department's public statements, Harbury met with National Security Advisor Anthony Lake, who told her that the government had "scraped the bottom of the barrel" for information about her husband and that no further information existed. Complaint ¶ 83. He promised that the government would not only continue searching for information, but also keep Harbury informed. Other State Department and NSC officials likewise told her that they had no concrete information about Bamaca's condition, but that they were continuing to assume that he was still alive. Suspecting that State and NSC officials were withholding information, Harbury filed a Freedom of Information Act request. Despite expedited processing, she received no documents in the following months.

Finally, because of the "failure of the [State Department and NSC] defendants to inform her of her husband's fate," Harbury announced that she would begin a hunger strike in front of the White House on March 12, 1995, the third anniversary of her husband's disappearance. Complaint ¶ 87. State Department and NSC officials then met with her again, telling her this time that they believed Bamaca was dead because so many years had passed without evidence that he was alive.

Unconvinced, Harbury began her hunger strike. Twelve days into the strike, Congressman Robert Torricelli announced publicly that years earlier, Bamaca had been killed at the order of a paid CIA asset.

On her own behalf and as administratrix of Bamaca's estate, Harbury brought suit in the U.S. District Court here against various named and unnamed officials of the CIA, the State Department, and the NSC. She based her claims on two broad factual allegations. First, she alleged that CIA officials at all levels "knowingly engaged in, directed, collaborated and conspired in, and otherwise contributed to [her husband's] secret imprisonment, torture and extrajudicial murder." Complaint ¶ 49. Many of the Guatemalan military officers who tortured and killed Bamaca, she alleged, were paid CIA agents. Two had been trained in torture and interrogation techniques at the School of the Americas, a U.S. Army facility located in Georgia. According to Harbury, CIA officials who did not participate directly in Bamaca's torture not only paid Agency assets for information about Bamaca's rebel organization, knowing that the information had been extracted through torture, but also requested further intelligence, knowing it too would be obtained in the same manner. And as a general matter, Harbury alleged that CIA officials knew of other gross human rights violations in Guatemalan interrogation centers—including beatings with cement blocks, burials of prisoners alive, and electrical shocks to the testicles and legs—and that CIA officials up the chain of command, from the operations and intelligence divisions to the Director himself, expressly authorized their assets to use torture to obtain information from Guatemalan rebel leaders.

Second, Harbury alleged that while Bamaca was still alive, State Department and NSC officials, including Ambassador McAfee and NSA Lake, made "fraudulent statements and intentional omissions" that

prevented her from "effectively seeking adequate legal redress, petitioning the appropriate government authorities, and seeking to publicize her husband's true plight." Complaint ¶ 98. According to the complaint, when Harbury first contacted State Department officials to follow up on what she had learned from the escaped prisoner, they actually knew that her husband was alive and being tortured. They knew this, she alleged, because a week after Bamaca's capture, the CIA informed both State Department and White House officials that Guatemalan military forces would "probably fabricate his combat death in order to maximize their ability to extract information from [him]." Id. at ¶¶ 35, 56–57. Yet State Department officials, including Ambassador McAfee, revealed none of this information to Harbury. Instead, they repeatedly reassured her that although they were investigating Bamaca's fate, they had discovered nothing. According to Harbury, internal memoranda distributed and received by both State Department and NSC officials demonstrate their "intent to keep the involvement of the U.S. Government in the detention, torture, and execution of Mr. Bamaca out of the public eye." Id. at ¶ 69. Those officials, she alleged, "intentionally misled [Harbury], through their deceptive statements and omissions, into believing that concrete information about her husband's fate did not exist because they did not want to threaten their ability to obtain information from Mr. Bamaca," and because they feared that if they disclosed information to Harbury or anyone else, "they could then be subject to public embarrassment, censure, and/or legal liability." Id. at ¶¶ 67–69.

After Bamaca's death, the pattern of deception and nondisclosure allegedly continued. Although the Defense Intelligence Agency reported in September 1993 to the State Department, the White House, and the U.S. Embassy in Guatemala that Bamaca had been killed, all officials Harbury met with during the following months, including NSA Lake, continued to lead her

to believe not only that her husband was alive, but also that they were doing all they could to learn more about him. "[A]t no time," she alleged, did these officials inform her that "they were unwilling to investigate her case or to give her information about her husband's situation. Instead, a decision was made to neither share the information with her, nor inform her of the existence of such information." Id. at ¶ 77.

Based on these factual allegations, Harbury pleaded 28 specific causes of action, including (1) claims against defendants in their official capacities seeking a declaratory judgment that their conduct was unconstitutional, as well as an injunction preventing the CIA from extracting information through torture and preventing the State Department and NSC from concealing information about CIA torture victims; (2) Bivens actions against defendants in their individual capacities seeking damages for their alleged constitutional violations; (3) common law tort claims against individual defendants, including claims for intentional infliction of emotional distress and wrongful death; and (4) claims against individual defendants for violations of international law. Only Harbury's Bivens claims are directly at issue in this appeal. These claims rest on three alleged constitutional violations: (1) by contributing to Bamaca's torture, CIA defendants violated his Fifth Amendment substantive due process rights; (2) by participating in and concealing information about Bamaca's torture and murder, all defendants violated Harbury's constitutional right to familial association; and (3) by concealing information and misleading her about her husband's fate, NSC and State Department defendants violated her right of access to courts.

The district court dismissed Harbury's Bivens claims, finding with respect to each not only that she failed to allege a deprivation of an actual constitutional right, but also that even if she had, defendants were

entitled to qualified immunity because the scope of the alleged right was not clearly established. Pursuant to Federal Rule of Civil Procedure 54(b), the district court certified its dismissal of Harbury's *Bivens* claims as final. We review *de novo* a dismissal for failure to state a claim upon which relief can be granted, accepting the facts as alleged in the complaint. *See Moore,* 65 F.3d at 192. "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

## II

*Harlow v. Fitzgerald* holds that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Following *Harlow* and abiding by the familiar practice of avoiding unnecessary adjudication of constitutional questions, many courts faced with claims resting on constitutional rights of uncertain scope have dismissed cases based on qualified immunity alone. *See, e.g., Childress v. Small Bus. Admin.,* 825 F.2d 1550, 1552 (11th Cir.1987). In other words, "assum[ing], arguendo, without deciding" that a constitutional right in fact exists, courts have asked whether the right is clearly established. *See id.*

The Supreme Court cast doubt on this approach in *Wilson v. Layne*: "A court evaluating a claim of qualified immunity must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (internal quotation omitted). As the Court had previously recognized, "if the policy of avoidance [of unnecessary adjudication of constitutional issues] were always followed in favor of ruling on qualified immunity whenever there was no clearly settled constitutional rule of primary conduct, standards of official conduct would tend to remain uncertain, to the detriment both of officials and individuals." *County of Sacramento v. Lewis,* 523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998).

■ Notwithstanding *Wilson,* the Government urges us to dispose of this case based on qualified immunity without reaching the merits of Harbury's underlying claims. In support of this argument, it cites our recent decision in *Kalka v. Hawk,* 215 F.3d 90 (D.C.Cir.2000), where the district court had dismissed a complaint brought by a federal prisoner claiming that the Bureau of Prisons had denied him his First Amendment right to practice secular humanism. Without reaching the merits of Kalka's constitutional claim, we affirmed based on qualified immunity alone. The Supreme Court's concern that the scope of the underlying constitutional right would never be adjudicated, we held, had "little force when injunctive relief against the official's actions is potentially available." *Id.* at 97. Although Kalka's own claim for injunctive relief had become moot (he had been released from prison during his appeal), "there is still the potential that other prisoners who practice humanism may bring such suits and settle the question whether humanism ... is a religion within the First Amendment. This possibility of injunctive actions satisfies the Court's desire for 'clarity in the legal standards for official conduct.'" *Id.* (quoting *Wilson,* 526 U.S. at 609, 119 S.Ct. 1692).

In certain respects, this case does resemble *Kalka.* Like Kalka, Harbury alleges that the challenged government conduct is ongoing: in a part of her suit not before us, Harbury claims that the government still extracts information through torture and covers up information about

the victims. Also like Kalka, Harbury herself is no longer subject to the challenged conduct: Bamaca's torture ended with his death, and sufficient facts about U.S. involvement in his treatment have come to light to enable Harbury to seek legal relief.

At this point, however, the similarities with *Kalka* end. Harbury has been able to challenge the conduct of the government only because its cover-up failed. If the cover-up had succeeded, Harbury would have learned neither of CIA involvement in her husband's torture nor of NSC and State Department attempts to keep that involvement secret. Thus, unlike in *Kalka,* where future secular humanist prisoners could seek injunctive relief for denial of First Amendment rights (so long as they remained incarcerated), the very nature of the conduct Harbury challenges renders unlikely the possibility of injunctive relief: another spouse in Harbury's position could challenge her husband's torture only if she learned of the torture before it ended. In essence, the Government asks us to defer adjudication of the constitutionality of its alleged conduct until it again fails in a cover-up, this time before the victim dies. Nothing in *Kalka* requires such a preposterous result.

Applying *Wilson,* then, we must address the validity of Harbury's constitutional allegations before reaching the question of qualified immunity. It is to that task that we now turn.

### *Fifth Amendment*

■ Government conduct that "shocks the conscience" violates the Fifth Amendment guarantee against deprivation of "life, liberty, or property, without due process of law." *See Rochin v. California,* 342 U.S. 165, 172–73, 72 S.Ct. 205, 96 L.Ed. 183 (1952). No one doubts that under Supreme Court precedent, interrogation by torture like that alleged by Harbury shocks the conscience. *See id.* at 172, 72 S.Ct. 205 (interrogation methods were "too close to the rack and the screw

to permit of constitutional differentiation"); *Palko v. Connecticut,* 302 U.S. 319, 326, 58 S.Ct. 149, 82 L.Ed. 288 (1937), *overruled on other grounds by Benton v. Maryland,* 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969) (noting that the Due Process Clause must at least "give protection against torture, physical or mental"). The difficult question, and the one presented by this case, is whether the Fifth Amendment prohibits torture of non-resident foreign nationals living abroad. Before reaching that question, however, we must consider Harbury's claim that because many of the CIA, NSC, and State Department officials who she says conspired to torture her husband did so within the United States, this case does not require extra-territorial application of the Fifth Amendment.

In support of this argument, Harbury cites *Cardenas v. Smith,* 733 F.2d 909 (D.C.Cir.1984), which involved a Colombian citizen whose Swiss bank accounts were seized by Swiss authorities at the request of the U.S. Department of Justice. Despite the fact that the seized accounts were located in Switzerland, we suggested in dicta that the plaintiff might be able to establish injury within the U.S. by showing that her accounts were seized as a result of an unlawful conspiracy within the Justice Department. *Id.* at 913. Harbury also cites *Lamont v. Woods,* 948 F.2d 825 (2d Cir.1991), which involved allegations that the U.S. Government violated the Establishment Clause of the First Amendment by giving grants to foreign religious schools. Even though the money was delivered and spent abroad, the court held that the alleged violation of the Establishment Clause was domestic because it occurred when the federal agency allocated the funds. *Id.* at 834.

Harbury fails to notice the relevance of *United States v. Verdugo–Urquidez,* 494 U.S. 259, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990), a case she cites later in her brief, where the Supreme Court held that a warrantless search and seizure of an alien's property in Mexico did not violate

the Fourth Amendment. The search was conceived, planned, and ordered in the United States, carried out in part by agents of the United States Drug Enforcement Agency, and conducted for the express purpose of obtaining evidence for use in a United States trial. *See id.* at 262–63, 110 S.Ct. 1056. Still, the Court treated the alleged violation as having "occurred solely in Mexico." *Id.* at 264, 110 S.Ct. 1056. In reaching this conclusion, the Court never mentioned that the search was both planned and ordered from within the United States. Instead, it focused on the location of the primary constitutionally significant conduct at issue: the search and seizure itself.

We think *Verdugo–Urquidez* controls this case. Like the warrantless search there, the primary constitutionally relevant conduct at issue here—Bamaca's torture—occurred outside the United States. The same was not true in *Lamont*. And *Cardenas*, on which Harbury also relies, was decided prior to *Verdugo–Urquidez*. We thus turn to Harbury's primary claim—that Bamaca was entitled to Fifth Amendment protection even though the torture occurred in Guatemala.

Acknowledging that aliens are entitled to fewer constitutional protections than citizens, *see Mathews v. Diaz*, 426 U.S. 67, 77–79, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976), and that constitutional protections (even for citizens) diminish outside the U.S., *see Verdugo–Urquidez*, 494 U.S. at 270, 110 S.Ct. 1056, Harbury argues that the Constitution's most fundamental protections, like the Fifth Amendment prohibition of torture, apply even to foreign nationals located abroad. In support of this claim, she cites three lines of cases holding that non-citizens outside the United States enjoy constitutional rights. First, courts have held that inhabitants of nonstate territories controlled by the U.S.—such as unincorporated territories or occupation zones after war—are entitled to certain "fundamental" constitutional rights. *See Examining Bd. of Eng'rs,*

*Architects & Surveyors v. Otero*, 426 U.S. 572, 599 n. 30, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976); *Balzac v. Porto Rico*, 258 U.S. 298, 312–13, 42 S.Ct. 343, 66 L.Ed. 627 (1922); *United States v. Tiede*, 86 F.R.D. 227, 242–44 (U.S.Ct.Berlin 1979). Courts have also held that excludable aliens—aliens apprehended outside the U.S. while attempting to cross the border and held within the U.S. pending trial—likewise enjoy basic due process rights against gross physical abuse. *See Amanullah v. Nelson*, 811 F.2d 1, 9 (1st Cir.1987); *Lynch v. Cannatella*, 810 F.2d 1363, 1374 (5th Cir.1987). Finally, courts have suggested that non-resident aliens abducted by the government for trial within the United States have basic due process rights. *See United States v. Toscanino*, 500 F.2d 267 (2d Cir. 1974); *see also United States v. Lambros*, 65 F.3d 698, 701 (8th Cir.1995).

Although these cases demonstrate that aliens abroad may be entitled to certain constitutional protections against mistreatment by the U.S. Government, we do not agree that they establish that Bamaca's torture ran afoul of the Fifth Amendment. To begin with, in adjudicating the application of constitutional rights to aliens, the Supreme Court has looked—among other factors—to whether the aliens have "come within the territory of the United States and developed substantial connections with this country." *See Verdugo–Urquidez*, 494 U.S. at 271, 110 S.Ct. 1056. In all three sets of cases Harbury cites, the aliens had a substantially greater connection to the U.S. than Bamaca. The excludable alien cases involved persons physically present in the U.S. The occupation zone cases involved foreign nationals under de facto U.S. political control. And although the alien in *Toscanino* had been tortured in a foreign country, he was abducted to and tried in the United States. In fact, the Second Circuit, treating the torture and abduction as part of the pre-trial process, focused on the fact that allowing the government to seize and torture defendants before bringing them to trial would threat-

en the integrity of the United States judicial process. *See Toscanino,* 500 F.2d at 275–79. In contrast to the aliens involved in these cases, Bamaca was not physically present in the United States, not tortured in a country in which the United States exercised de facto political control, and not abducted for trial in a United States court.

■ Even if the cases Harbury cites were not so easily distinguishable, this issue would also be controlled by *Verdugo–Urquidez.* Though that case involved extraterritorial application of the Fourth Amendment, the Court also dealt with the extraterritorial application of the Fifth:

> Indeed, we have rejected the claim that aliens are entitled to Fifth Amendment rights outside the sovereign territory of the United States. In *Johnson v. Eisentrager* ... the Court held that enemy aliens arrested in China and imprisoned in Germany after World War II could not obtain writs of habeas corpus in our federal courts on the ground that their convictions for war crimes had violated the Fifth Amendment.... The *Eisentrager* opinion acknowledged that in some cases constitutional provisions extend beyond the citizenry; "the alien ... has been accorded a generous and ascending scale of rights as he increases his identity with our society." But our rejection of the extraterritorial application of the Fifth Amendment was emphatic:
>
> > "Such extraterritorial application of organic law would have been so significant an innovation in the practice of governments that, if intended or apprehended, it could scarcely have failed to excite contemporary comment. Not one word can be cited. No decision of this Court supports such a view.... None of the learned commentators on our Constitution has even hinted at it. The practice of every modern government is opposed to it."

*Id.* at 269, 110 S.Ct. 1056 (quoting *Johnson v. Eisentrager,* 339 U.S. 763, 770, 784–85, 70 S.Ct. 936, 94 L.Ed. 1255 (1950)). To be sure, as Harbury points out, this language is dicta. But it is firm and considered dicta that binds this court. *See, e.g., United States v. Oakar,* 111 F.3d 146, 153 (D.C.Cir.1997) ("[c]arefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative") (internal quotation omitted). Harbury also correctly observes that *Eisentrager*—the case relied on by *Verdugo–Urquidez*—concerned rights of enemy aliens during wartime. But the Supreme Court's extended and approving citation of *Eisentrager* suggests that its conclusions regarding extraterritorial application of the Fifth Amendment are not so limited. For these reasons, we agree with the district court that Harbury failed to allege a valid claim for deprivation of her husband's Fifth Amendment due process rights.

### Familial Association

■ The Constitution protects familial relationships from unwarranted government interference in at least two circumstances. First, parents have a right to maintain their relationship with their children. *See, e.g., Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (holding that a state must support allegations of parental neglect with at least clear and convincing evidence before terminating the rights of parents in their natural child); *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (striking down a law automatically making children of unwed fathers wards of the State upon the death of their mother). Second, family members have a constitutional right to make certain private decisions regarding family affairs, such as whether to procreate, *see Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (abortion), *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (contraception), or whether to send children to public school, *see Pierce v. Soc'y of Sisters,* 268 U.S. 510, 45 S.Ct. 571,

69 L.Ed. 1070 (1925). Harbury's claims rest on both categories of rights.

Relying on the first category, Harbury argues that by murdering Bamaca, CIA defendants unconstitutionally deprived her of her right to continuing association with her husband. The district court dismissed this claim because Harbury failed to allege that the defendants murdered Bamaca for the purpose of ending her marriage. Urging us to reverse, Harbury argues that the district court's purpose requirement conflicts with Supreme Court cases finding due process violations in circumstances involving far less serious interference with familial relationships—such as laws requiring children to attend public schools—and no direct purposeful interference with the family. To be sure, these cases involve the second category of rights—the right to make private familial decisions—but Harbury argues that there is no principled reason to impose a purpose requirement in the first category and not the second. Harbury also argues that since officials will likely never kill anyone for the purpose of terminating a marriage, a purpose requirement effectively eviscerates familial association claims based on wrongful killings.

Our sister circuits have split on whether familial association claims require allegations of purposeful interference. Some circuits have held that the Due Process Clause only protects against direct, intentional interference with familial relationships. In *Ortiz v. Burgos,* for example, the First Circuit held that the stepfather and siblings of a prisoner beaten to death by guards had no independent cause of action for loss of familial association because the beating was not specifically intended to deprive them of their association with the decedent. 807 F.2d 6, 8 (1st Cir.1986); *see also Shaw v. Stroud,* 13 F.3d 791, 804–05 (4th Cir.1994); *Harpole v. Arkansas Dep't of Human Servs.,* 820 F.2d 923, 927–28 (8th Cir.1987); *Trujillo v. Bd. of County Comm'rs.,* 768 F.2d 1186, 1189–90 (10th Cir.1985). But other cir-

cuits have held in cases of wrongful killings of children that the surviving parent had an independent due process claim, even though the killing was not specifically intended to disrupt the parent–child relationship. In one such case, *Bell v. City of Milwaukee,* the Seventh Circuit held that the father (but not the siblings) of a decedent wrongfully killed by the police had a constitutional claim for loss of association with his son even though the killing was motivated by racism, not intent to deprive him of his son's companionship. 746 F.2d 1205, 1242–48 (7th Cir.1984); *see also Smith v. City of Fontana,* 818 F.2d 1411, 1417–20 (9th Cir.1987); *Estate of Bailey v. County of York,* 768 F.2d 503, 509 n. 7 (3d Cir.1985).

In considering Harbury's claim, we are mindful of the caution we must exercise in expanding the liberty interests protected by substantive due process. "As a general matter," the Supreme Court said in *Collins v. Harker Heights,* "[we have] always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended. The doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field." 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992) (citation omitted).

Bearing this caution in mind, as well as the obvious proposition that it operates with even greater force on the lower federal courts, we think that two features of Supreme Court precedent bar us from accepting Harbury's claim. First, although the Court has never directly addressed the issue in the context of a wrongful killing, it has found a constitutional right to continuing association with family members only in cases involving direct, purposeful interference with familial relationships. *See, e.g., Stanley,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551; *Santosky,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599. As the First Circuit observed, the Court has "nev-

er held that governmental action that affects the parental relationship only incidentally ... is susceptible to challenge for a violation of due process." *Ortiz,* 807 F.2d at 8. Equally significant, the Supreme Court has recognized a right to continuing familial association only in cases involving parent–child relationships. In doing so, the Court has emphasized the importance of the parent-child bond. *See, e.g., Stanley,* 405 U.S. at 651, 92 S.Ct. 1208 (noting that the Court had previously deemed the rights to conceive and raise one's children as "essential," "basic," and "far more precious ... than property rights"); *Santosky,* 455 U.S. at 753, 102 S.Ct. 1388 (referring to the "fundamental liberty interest of natural parents in the care, custody, and management of their child," and ·to parents' "vital interest in preventing the irretrievable destruction of their family life"). Even circuit court cases that have expanded the right to include indirect deprivations of association involve only parent-child relationships. *See Bell,* 746 F.2d at 1242–48; *Smith,* 818 F.2d at 1417–20; *Estate of Bailey,* 768 F.2d at 509 n. 7. And in one such case, *Bell,* the court expressly declined to broaden the right to include the decedent's surviving siblings. *See* 746 F.2d at 1245–48.

■ Harbury's claim thus lies beyond Supreme Court precedent in not one but two respects: it concerns neither a parent-child relationship nor purposeful interference with a familial relationship. On the facts of this case, therefore, we need not decide whether the constitutional right to continuing familial association requires allegations of purpose to interfere with the right, nor whether the constitutional right to familial association extends to the marriage relationship. We hold only that in view of Supreme Court precedent and in light of the Court's admonition in *Collins,* we cannot extend a constitutional right to familial association to cases where, as here, the government has indirectly interfered with a spousal relationship. The First Circuit, declining to extend due process protection to incidental deprivations of familial association, used language we think particularly compelling:

> Although we recognize and deplore the egregious nature of the alleged government action in this case, we hesitate, in the rather novel context of this case, to erect a new substantive right upon the rare and relatively uncharted terrain of substantive due process when case law, logic and equity do not command us to do so. It does not necessarily follow that the incidental deprivation of even a natural parent's parental rights is actionable simply because the relevant deprivation of life is shocking. In addition, a conclusion that governmentally caused termination of, or encroachment on, the parental interest in the continued relationship with a child always is actionable would constitutionalize adjudication in a myriad of situations we think inappropriate for due process scrutiny, including the alleged wrongful prosecution and incarceration of a child or the alleged wrongful discharge of a child from a state job, forcing the child to seek employment in another part of the country. Moreover, the problem of giving definition and limits to a liberty interest in this vast area seems not only exceedingly difficult but to a considerable extent duplicative of the widespread existence of state causes of action, as in this case, which provide some compensation to grieving relatives.

*Ortiz,* 807 F.2d at 9. Emphasizing that it sought "neither to minimize the loss of a family member nor to denigrate the fundamental liberty interest in matters of family life that has long been a part of our constitutional fabric," the First Circuit concluded: "even an interest of great importance may not always be entitled to constitutional protection.... Our conclusion is simply that, in light of the limited nature of the Supreme Court precedent in this area, it would be inappropriate to extend recognition of an individual's liberty interest in his or her family or parental relationship to

the facts of this case." *Id.* at 9–10 (citations omitted). For essentially similar reasons, we are doubly reluctant to make the even broader expansion of the right to familial association sought by Harbury.

■ Harbury's second familial association claim, this one brought against State Department and NSC defendants, charges that their failure to disclose information about Bamaca violated her right to make intimate personal decisions about her marriage. To support this claim, she cites *Planned Parenthood v. Casey,* where the Supreme Court stated that decisions within the "private realm of family life" are among "the most intimate and personal choices a person may make in a lifetime," and are "central to the liberty protected by the Fourteenth Amendment." 505 U.S. 833, 851, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). Relying on this broad language, Harbury asserts that she had a due process right to decide how best to save her husband from torture and retrieve his remains and bury him after he died. Defendants, she urges, prevented her from making these decisions by concealing information about his torture and death.

We agree with the district court that Harbury's claim lacks foundation in constitutional jurisprudence. The broad general principle Harbury cites appears never to have been applied to a situation even remotely like hers. Nor does she explain why it should be. We therefore decline to extend the right in the manner she proposes.

### III

■ This brings us to our only area of disagreement with the district court: Harbury's access to courts claim. "[T]he right to sue and defend in the courts," the Supreme Court long ago said, "is the alternative of force. In an organized society it is the right conservative of all other rights, and lies at the foundation of orderly government. It is one of the highest and most essential privileges of citizenship." *Chambers v. Baltimore & Ohio R.R.,* 207 U.S. 142, 148, 28 S.Ct. 34, 52 L.Ed. 143 (1907). The right not only protects the ability to get into court, *see, e.g., Ex parte Hull,* 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941) (striking down a prison regulation prohibiting prisoners from filing petitions for habeas corpus unless they are found "properly drawn" by a state official), but also ensures that such access be "adequate, effective, and meaningful." *Bounds v. Smith,* 430 U.S. 817, 822, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977).

Applying this standard, several of our sister circuits have found that government cover-ups can infringe the right of access to courts. In *Bell,* 746 F.2d 1205, for example, city police officers planted evidence and contrived a false story to make their killing of an unarmed man whom they shot in the back seem an act of self-defense. The victim's father filed a wrongful death action against both the officer and the city, but the case settled for an amount so small that the father never cashed the check. When the true facts of the killing emerged twenty years later, the victim's survivors sued the police, alleging that the conspiracy to conceal the facts had interfered with their ability to seek legal redress. Sustaining a jury verdict for plaintiffs, the Seventh Circuit found that "[t]hough [Bell's father] filed a wrongful death claim in state court soon after the killing, the cover-up and resistance of the investigating police officers rendered hollow his right to seek redress...." *Id.* at 1261.

The Fifth Circuit reached a similar result in *Ryland v. Shapiro,* 708 F.2d 967 (5th Cir.1983), recognizing a potential denial of the right of access when an alleged cover-up delayed release of the facts of a murder for eleven months. Noting that "[d]elay haunts the administration of justice," the court held that the victim's parents could state a denial of access claim since "[t]he defendants' actions could have prejudiced [their] chances of recovery in state court because the resulting delay would cause stale evidence and the fading

of material facts in the minds of potential witnesses." *Id.* at 974, 975; *see also Swekel v. City of River Rouge,* 119 F.3d 1259, 1263–64 (6th Cir.1997) (plaintiff must "[show] that the defendants' actions foreclosed her from filing suit in state court or rendered ineffective any state court remedy she previously may have had"); *Delew v. Wagner,* 143 F.3d 1219, 1222 (9th Cir. 1998) (same); *Vasquez v. Hernandez,* 60 F.3d 325, 329 (7th Cir.1995) (plaintiffs must allege either that they have "been prevented from pursuing a tort action in state court or that the value of such an action has been reduced by the cover-up"); *cf. Barrett v. United States,* 798 F.2d 565, 575 (2d Cir.1986) ("Unconstitutional deprivation of a cause of action occurs when government officials thwart vindication of a claim by violating basic principles that enable civil claimants to assert their rights effectively.").

■ Citing *Bell, Ryland,* and other similar cases, Harbury argues that NSC and State Department defendants, by giving her "false and deceptive information related to her husband and otherwise concealing whether he was alive, ... deprived Plaintiff of her right ... to adequate, effective, and meaningful access to the courts." Complaint ¶ 174. The Government responds that Harbury "failed to identify a ... constitutional right to have federal officials report on what they knew about a foreign revolutionary leader captured by a foreign government on the field of battle." Appellee's Br. at 14. According to the Government, this failure distinguishes Harbury's case from *Bell* and other cases where police officers charged with investigating a crime destroy, conceal, or manufacture evidence in violation of statutory duties.

We think the Government misreads Harbury's complaint. She never alleges that defendants breached a duty to disclose information to her. Rather, she alleges that they affirmatively deceived her into believing that they were actively seeking information about her husband. In-

stead of saying (as they could have) that they were unable to discuss Bamaca's situation, they sought to lull her into believing that they were working on her behalf, intending to prevent her from suspecting that the U.S. Government was actually involved in Bamaca's torture. One of their express objectives, Harbury alleges, was to prevent her from suing them. Viewed this way, and regardless of whether State and NSC officials had an affirmative duty to provide information to Harbury in the first place, the complaint states a clear case of denial of access to courts. *Cf. Barrett,* 798 F.2d 565, 575 (though defendant government officials "were not under any duty to volunteer to the estate information that would alert it to the existence of a claim against the federal government and certain of its officials ... government officials were not free to arbitrarily interfere with the estate's vindication of its claims").

■ The district court, though agreeing that Harbury might be able to base an access to courts claim on the alleged cover-up, nevertheless dismissed her claim because she had not yet finished prosecuting the tort claims also pleaded in her complaint. In reaching this conclusion, the district court relied on *Swekel,* where the Sixth Circuit rejected an access to courts claim because the plaintiff had not yet filed suit in state court: "Before filing an 'access to courts' claim, a plaintiff must make some attempt to gain access to the courts; otherwise, how is this court to assess whether such access was in fact 'effective' and 'meaningful'?" 119 F.3d at 1264. The district court also cited *Delew,* 143 F.3d 1219, where the Ninth Circuit dismissed an access to courts claim even though the plaintiff, unlike the plaintiff in *Swekel,* had actually filed a wrongful death action based on the same set of facts. Stating that "because the [plaintiffs'] wrongful death action remains pending in state court, it is impossible to determine" whether "the defendants' cover-up violated [the plaintiffs'] right of access to the courts by

rendering 'any available state court remedy ineffective,'" the court gave plaintiffs leave to re-file "if in fact the defendants' alleged cover-up actually rendered all state court remedies ineffective." *Id.* at 1222–23.

In some ways this case does resemble *Swekel* and *Delew*. Like plaintiffs in those cases, Harbury alleges that due to the cover-up, "key witnesses ... may now be dead or missing, ... crucial evidence may have been destroyed, and ... memories may have faded." *Harbury v. Deutch*, No. 96–00438 (D.D.C. filed Mar. 23, 1999) at 18. If her complaint rested solely on such allegations, we might agree with the district court. But Harbury's complaint goes further: not limited to wrongful death and intentional infliction of emotional injury, it alleges that but for the cover-up, she might have been able to save her husband's life. "As a result of the fraudulent statements and intentional omissions made by the Department of State and the [NSC] defendants ... Plaintiff was unable to take appropriate actions to save her husband's life. Specifically, Plaintiff was foreclosed from effectively seeking adequate legal redress, petitioning the appropriate government authorities, and seeking to publicize her husband's true plight through the media." Complaint ¶ 98. Amplifying this point at oral argument, Harbury's counsel explained that if defendants had disclosed the information they possessed about Bamaca, Harbury could have sought an emergency injunction based on an underlying tort claim for intentional infliction of emotional distress. Even if the NSC and State Department officials had simply said they could not discuss Bamaca's situation, counsel explained, Harbury would have filed her FOIA requests immediately, thus perhaps obtaining the information necessary to seek an injunction in time to save her husband's life. Instead, believing defendants' reassurances, Harbury waited for the State Department and NSC officials to complete their "investigation."

If Harbury's allegations are true, then defendants' reassurances and deceptive statements effectively prevented her from seeking emergency injunctive relief in time to save her husband's life. Because his death completely foreclosed this avenue of relief, nothing would be gained by requiring Harbury to postpone this aspect of her access to courts cause of action until she finishes prosecuting her tort claims.

The Government offers another reason for affirming the district court. Relying on *Swekel*, it argues that since Harbury "always had the option to file suit with or without information from any defendant," her claim should be dismissed based on her failure to file such a suit. *See* Appellee's Br. at 15 n.5 and accompanying text. But again, *Swekel* is very different from this case. There, police allegedly concealed the identity of a potential defendant involved in a fatal accident until after the statute of limitations had run. When the victim's spouse filed a deprivation of access to courts claim, the Sixth Circuit dismissed, observing that "[no] evidence ... establishes that [plaintiff] even attempted to go to the state court in the first instance." *Swekel*, 119 F.3d at 1264. The trial court, moreover, had found that the plaintiff had been aware of all essential facts of the accident except the defendant's identity, and thus could have filed a "John Doe" suit despite the cover-up. *See id.* at 1261. Harbury, in contrast, asserts that she "had no idea that the United States Government was aware of, much less involved in, her husband's detention and torture." Thus "unaware that there was a potential claim of any kind against any U.S. officials," Harbury had "no reason to believe that she could state a claim in United States courts." Appellant's Reply Br. at 14. Unlike in *Swekel*, therefore, not only did defendants allegedly deprive Harbury of any opportunity to seek relief in the courts, but they effectively concealed most of the "essential facts" of the case, including U.S. Government involvement, until after emergency injunctive relief

would have been futile. *Cf. Swekel,* 119 F.3d at 1264 n. 2 (recognizing that plaintiff need not file a prior suit if "it would be completely futile for a plaintiff to attempt to access the state court system").

■ Concluding that Harbury has pleaded an access to courts claim, however, does not end our task, for the district court also found that even if Harbury could bring such a claim, defendants would be entitled to qualified immunity. For purposes of qualified immunity, it is not enough for a plaintiff to allege that a defendant's conduct violated a right that is clearly established in general terms. Instead, "the right the official is alleged to have violated must have been 'clearly established' in a more particularized ... sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful ... but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (citations omitted).

■ Applying this standard, the district court dismissed Harbury's access to courts claim because it includes no allegation of "nefarious conduct," such as manufacturing false evidence or destroying or refusing to collect evidence. *See Harbury,* No. 96–00438 at 19–20. Harbury claims only that defendants denied knowledge of Bamaca's torture and made "allegedly disingenuous overtures to assist her." *See id.* at 20. Because of this, and because State Department and NSC defendants did not conceal details about "local crimes" they were charged with investigating, but rather information about a "highranking commander of the Guatemalan National Revolutionary Union resistance forces" who had been captured during an armed conflict with the Guatemalan army, the district court ruled that it "[could not] hold

that Ambassador McAfee, NSA Lake, or the unnamed State Department and NSC defendants would have reasonably known that they [had to] be forthcoming in discussing the intelligence that they had received about Bamaca." *Id.* at 20–21.

We read Harbury's complaint quite differently. For one thing, as we have already shown, Harbury alleges not that defendants violated an affirmative duty to provide information, but that they affirmatively misled her. *See supra* at 608. Furthermore, defendants misled her, she alleges, precisely *because* they feared that if they gave her accurate information about Bamaca's fate, she might sue them. The relevant inquiry in Harbury's case, then, is this: would an objectively reasonable official have thought it clearly unconstitutional to affirmatively mislead Harbury for the express purpose of preventing her from filing a lawsuit? *Cf. Crawford–El v. Britton,* 951 F.2d 1314, 1317 (D.C.Cir.1992).

Before answering this question, we must dispose of the Government's argument that under *Harlow,* any inquiry into defendants' purpose in misleading Harbury is irrelevant to their qualified immunity defense. It is true that *Harlow* holds that an official's "subjective good faith" is irrelevant to evaluating a claim of qualified immunity. *See Harlow,* 457 U.S. at 815–19, 102 S.Ct. 2727. But we have understood *Harlow* principally to prevent inquiry into officials' knowledge or beliefs about the *legality* of their conduct. Except in national security cases—and the Government has not yet raised a national security defense in this case—we have not read *Harlow* to prohibit inquiry into an official's motives unrelated to knowledge of the law, when "a bad [motive] could transform an official's otherwise reasonable conduct into a constitutional tort." *See Crawford–El,* 951 F.2d at 1317; *see also Halperin v. Kissinger,* 807 F.2d 180, 186 (D.C.Cir. 1986) ("No court, as far as we are aware, has extended *Harlow*'s proscription of subjective inquiry beyond the issue of knowledge of the law and intent related to

knowledge of the law, except in a national security context."). The Supreme Court, moreover, has not only confirmed that *Harlow* allows inquiry into intent unrelated to knowledge of the law, but also held that plaintiffs making constitutional claims based on improper motive need not meet any special heightened pleading standard. *See Crawford–El v. Britton,* 523 U.S. 574, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998).

 Returning to the question before us—Should it have been clear to an objectively reasonable official that affirmatively misleading Harbury for the purpose of preventing her from filing a lawsuit would violate her constitutional rights?—we think the answer is plainly yes. Not only have five of our sister circuits held that coverups that conceal the existence of a cause of action (or make it difficult to prosecute one) infringe the constitutional right of access to courts, and not only are we unaware of any contrary decision, but we think it should be obvious to public officials that they may not affirmatively mislead citizens for the purpose of protecting themselves from suit. *Harlow* developed qualified immunity to protect public officials from "insubstantial lawsuits" that threatened to "[divert] official energy from pressing public issues" and "[deter] able citizens from acceptance of public office," as well as to ensure that these officials could exercise their discretion without fear of suit. *See Harlow,* 457 U.S. at 814, 102 S.Ct. 2727. Qualified immunity was never intended to protect public officials who affirmatively mislead citizens for the purpose of protecting themselves from being held accountable in a court of law. Joining our sister circuits, we therefore hold that when public officials affirmatively mislead citizens in order to prevent them from filing suit, they violate clearly established constitutional rights and thus enjoy no qualified immunity.

## IV

In conclusion, we reiterate what we said at the outset: because the district court dismissed Harbury's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), our task is to assess neither the strength nor plausibility of Harbury's allegations, but to determine whether, assuming the truth of her allegations, "[she] can prove [any] set of facts in support of [her] claim which would entitle [her] to relief." *Conley,* 355 U.S. at 45–46, 78 S.Ct. 99. Applying that standard, we reverse the district court's dismissal of Harbury's access to courts claim and remand for further proceedings. In all other respects we affirm.

*So ordered.*