Jennifer K. HARBURY, on her own behalf and as administratrix of the Estate of Efrain Bamaca–Velasquez Appellant,

v.

John M. DEUTCH, Director, Central Intelligence Agency (CIA), et al., Appellees.

No. 99–5307.

United States Court of Appeals, District of Columbia Circuit.

Filed April 6, 2001.

Before: HARRY T. EDWARDS, Chief Judge, GINSBURG and TATEL, Circuit Judges.

## ORDER

PER CURIAM:

Upon consideration of appellees' petition for rehearing filed January 26, 2001, it is

**ORDERED** that the petition be denied.

■ The Government claims that the panel opinion "marks a significant and potentially dangerous expansion of the constitutional 'right of access' to the courts," creating an "open-ended constitutional tort for every instance where a government official conceals information, or obstructs a judicial proceeding." Appellees' Petition for Reh'g at 1, 7. This is incorrect. To begin with, as a procedural matter, the opinion will not open the courts to a flood of constitutional access to courts claims. It endorses the general requirement that prior to bringing a claim for deprivation of access to courts based on an alleged cover-up, plaintiff must first press her underlying claims to ensure that the alleged cover-up in fact prejudiced her ability to seek relief. See Harbury v. Deutch, 233 F.3d 596, 608–09 (D.C.Cir.2000). The panel opinion permits Harbury to bring her access to courts claim now only because, if the facts she pleads are correct (this case is here on a motion to dismiss), defendants' actions "completely foreclosed" one of her primary avenues of relief. Id at 609. Moreover, as a substantive matter, the opinion distinguishes Harbury's situation from those where a plaintiff, despite a cover-up, has enough information to file a "John Doe" suit. Id. at 609–10. It thus expresses no view on the constitutionality of cover-ups that do not "conceal[ ] most of the essential facts" of a cause of action until bringing it would be "futile." Id. (internal quotation marks omitted). In addition, and most important, the opinion explicitly and repeatedly limits its holding to situations where—as Harbury alleges—defendants both affirmatively mislead plaintiffs *and* do so for the very purpose of protecting government officials from suit. See id. at 608, 610, 611.

The Government also alleges that cover-ups of the type alleged here are sometimes "necessary in order to protect the national security or to maintain the secrecy of classified intelligence sources or methods." Appellees' Petition for Reh'g at 2. Accordingly, the Government argues, the panel opinion threatens to "jeopardize foreign intelligence sources and implicate foreign relations." Id. As the opinion expressly points out, however, the Government never claimed, either before the district court or the panel, that the cover-up alleged by Harbury was necessary to maintain national security. See Harbury, 233 F.3d at 610. Having not yet filed an answer in this case, the Government is free to assert a national security defense when it does so.

■ Next, the Government claims that Harbury has failed to "point to a colorable claim that has been prejudiced by the alleged cover–up" and that "the injunctive action which was allegedly thwarted is not even colorable." Appellees' Petition for Reh'g at 9, 14. But Harbury specifically claimed in her complaint that the alleged cover-up "foreclosed [her] from effectively seeking adequate legal redress." See Complaint ¶ 98, cited in Harbury, 233 F.3d at 609. Such a "short and plain statement of the claim," FED.R.CIV.P. 8(a)(2), providing sufficient information to allow a party to "frame a responsive pleading," FED. R.CIV.P. 12(e), is all the federal rules re-

quire. *See Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1085–86 (D.C.Cir.1998). Moreover, on appeal—and without response from the Government—Harbury amplified this claim, explaining in her brief that if she had "learned of her husband's situation while he was still alive, she would have immediately initiated court proceeding[s] seeking emergency injunctive relief." Appellant's Opening Brief at 35. At oral argument, her counsel further explained that such an injunction could have been based on an underlying claim for intentional infliction of emotional distress. *Harbury*, 233 F.3d at 609. On a motion to dismiss, "the factual allegations of the complaint must be taken as true, and *any* ambiguities or doubts concerning the sufficiency of the claim must be resolved in favor of the pleader." *Doe v. United States Dept. of Justice*, 753 F.2d 1092, 1102 (D.C.Cir. 1985). Here, Harbury's proposed action for injunctive relief to save her husband's life is on its face colorable. *See Harbury v. Deutch*, No. 96–00438 at 27–28 (D.D.C. Mar. 23, 1999) (denying the Government's motion to dismiss Harbury's tort claims). On remand, it is certainly open to the Government to argue—if the record as it is developed so allows—that Harbury's hypothetical injunctive action would have been so unlikely to succeed that she cannot plausibly claim that defendants' alleged cover-up was a "substantial cause of [her] failure to obtain judicial relief." *Bell v. City of Milwaukee*, 746 F.2d 1205, 1263 n. 72 (7th Cir.1984).

Our dissenting colleagues suggest that "[n]o United States court could reach the alleged tortfeasors, Guatemalan nationals on Guatemalan soil, in order to prevent their killing Harbury's husband, another Guatemalan national." *Harbury v. Deutch*, No. 99–5307, slip op. dissent at 1 (Henderson, J., dissenting from denial of rehearing en banc). But as the intentional infliction of emotional distress claims Harbury also pleaded in her complaint demonstrate, see *Harbury*, 233 F.3d at 600, the alleged tortfeasors here were domestic: the government officials who allegedly conspired with, collaborated with, directed, and paid Bamaca's torturers. *See* Complaint at ¶ 200 ("The CIA Defendants' collaborating and/or conspiring with and/or directing Julio Roberto Alpirez and/or others who intentionally and secretly imprisoned, tortured and extrajudicially executed Mr. Bamaca constituted extreme and outrageous conduct."). Harbury's complaint also suggests that in her action for intentional infliction of emotional distress, she could have alleged injury not just to Bamaca, but also to herself; in other words, Harbury, a United States citizen, could have sought relief in a United States court on her own behalf against United States government officials. *See* Complaint at ¶ 201 ("This extreme and outrageous conduct was engaged in intentionally or recklessly and caused both Mr. Bamaca and Plaintiff to endure severe physical and emotional distress."). As Harbury explains in her response to the Government's petition, an injunctive action against these officials might have saved Bamaca's life by enjoining them from "directing, conspiring in, and paying for the continued secret detention and torture of her husband, and direct[ing] [them] to require the assets on the payroll to stop engaging in such behavior." Appellant's Response to Petition for Reh'g at 9. As we stated earlier, the Government is free to argue on remand that, either because of the nature (or absence) of the relationship between Bamaca's torturers and the CIA defendants, or for some other reason, the chances of this happening were too remote to justify awarding Harbury relief.

The Government next suggests that it is unclear "what legal liability the State Department and NSC officials were attempting to avoid," since "[Harbury's] state law tort claims regarding the torture of her husband are all directed at the CIA defendants." Appellees' Petition for Reh'g at 11. But access to courts claims are not restricted to cases in which officials are alleged to have covered up their own illegal actions, and the Government itself acknowledges that two of the cases it cites,

*Bell,* 746 F.2d at 1256–58, and *Ryland v. Shapiro,* 708 F.2d 967, 969 (5th Cir.1983), involve cover-ups of "coworkers' wrongdoing." *See* Appellees' Petition at 7. Here, Harbury alleges that all three defendant agencies worked together to conceal Bamaca's capture and torture in order to obtain the maximum amount of information from him. *See* Complaint at ¶ 167 ("[State and NSC defendants] have a long-standing policy, pattern or practice of providing false information, through fraudulent statements and intentional omissions, as to the fate of anyone injured or killed through the CIA's long-standing policy, pattern or practices related to the extraction of information."); *id.* at ¶ 67, *quoted in Harbury,* 233 F.3d at 600 ("[State and NSC defendants] intentionally misled [Harbury] ... because they did not want to threaten their ability to obtain information from Mr. Bamaca."). Moreover, after their initial cover-up of Bamaca's capture, State and NSC defendants themselves might have been subject to direct tort liability for their alleged concealment and misrepresentation. *See* Complaint at ¶ ¶ 217–37 (stating tort claims against these defendants for intentional infliction of emotional distress, intentional misrepresentation, negligent misrepresentation, and constructive fraud). In allegedly deceiving Harbury, they thus might have been attempting to avoid their own legal liability as well.

As to Harbury's allegations of defendants' intent, although the Government is correct that under *Crawford-El v. Britton,* 523 U.S. 574, 598, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998), a district court can require a plaintiff to support her complaint with "specific, nonconclusory factual allegations," Appellees' Petition for Reh'g at 11, the district court here did this only with respect to Harbury's conspiracy allegations against the CIA defendants—not with respect to Harbury's access to courts claim. *Harbury v. Deutch,* No. 96–00438 at 5 (D.D.C. July 20, 1998) (order requiring plaintiff to "put forward specific, nonconclusory factual allegations that establish improper motive" of CIA defendants).

Moreover, Harbury expressly alleged that "internal [State and NSC] memoranda" reveal the defendants' intent to mislead Harbury. *Harbury,* 233 F.3d at 600.

■ Finally, with respect to the Government's qualified immunity arguments, neither the fact that defendants did not "fabricat[e] evidence," Appellees' Petition for Reh'g at 14, nor the fact that the alleged torture occurred outside the United States is enough to entitle the defendants to qualified immunity. Under *Anderson v. Creighton,* the "very action in question" need not have been previously held unlawful; rather, the law need only allow officials " 'reasonably [to] anticipate when their conduct may give rise to liability for damages.' " 483 U.S. 635, 639–40, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (quoting *Davis v. Scherer,* 468 U.S. 183, 195, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984)). Here, defendants allegedly acted affirmatively to mislead Harbury and did so with a specific intent to deny her access to a federal court. Under existing caselaw, such action was clearly unconstitutional. *See Delew v. Wagner,* 143 F.3d 1219, 1222 (9th Cir.1998) (following the Sixth Circuit and stating that "the Constitution guarantees plaintiffs the right of meaningful access to the courts, the denial of which is established where a party engages in pre-filing actions which effectively cover[ ]-up evidence and actually render[ ] any state court remedies ineffective"); *Swekel v. City of River Rouge,* 119 F.3d 1259, 1262 (6th Cir.1997) ("if a party engages in actions that effectively cover-up evidence ... they have violated his right of access to the courts"); *Vasquez v. Hernandez,* 60 F.3d 325, 328 (7th Cir.1995) ("[E]fforts by state actors to impede an individual's access to courts ... may provide the basis for a constitutional claim under 42 U.S.C. § 1983."); *Crowder v. Sinyard,* 884 F.2d 804, 812 (5th Cir. 1989) ("[I]f state officials wrongfully and intentionally conceal information crucial to a person's ability to obtain redress through the courts, and do so for the purpose of frustrating that right, and that conceal-

ment and the delay engendered by it substantially reduce the likelihood of one's obtaining the relief to which one is otherwise entitled, they may have committed a constitutional violation."); *Ryland*, 708 F.2d at 973 (constitutional right of access violated where "agents of the state intentionally engaged in conduct that interfered with [the] exercise of [the] constitutionally protected right to institute a wrongful death suit"); *cf. Barrett v. United States*, 798 F.2d 565, 575 (2d Cir.1986) ("[G]overnment officials," though "not under any duty to volunteer to [plaintiff] information that would alert it to the existence of a claim against the federal government and certain of its officials for ... wrongful death," "[o]n the other hand ... were not free to arbitrarily interfere with [plaintiff's] vindication of its claims. Unconstitutional deprivation of a cause of action occurs when government officials thwart vindication of a claim by violating basic principles that enable civil claimants to assert their rights effectively.").

 In arguing that defendants are entitled to qualified immunity, our dissenting colleagues again rely on the notion that the tortfeasors here are foreign nationals: they suggest that reasonable officials could have thought it constitutional to cover up Bamaca's "captivity by foreign nationals on foreign soil in order to keep [Harbury] from obtaining relief in a United States court that would prevent her husband's subsequent murder on foreign soil at the hands of the foreign nationals." *Harbury*, No. 99–5307, slip op. dissent at 2. But again, Harbury does not allege that defendants violated her right of access to courts by covering up the actions of foreign nationals unassociated with the United States government. Rather, she alleges that defendants are liable for misleading her about the involvement of United States government officials who allegedly "engaged in, directed, collaborated and conspired in, and otherwise contributed to" Bamaca's torture and murder. *See* Complaint at ¶ 49, *quoted in Harbury*, 233 F.3d at 599. Similarly, the legal liability defendants allegedly intended to avoid was not the liability of Guatemalan nationals unassociated with the United States government, but rather the liability of fellow United States Government officials for their involvement in Bamaca's torture.