187 F.3d 24 (1st Cir. 1999)
 NEO GEN SCREENING, INC., Plaintiff, Appellant,
v.
NEW ENGLAND NEWBORN SCREENING PROGRAM, d/b/a NEW ENGLAND REGIONAL NEWBORN SCREENING PROGRAM, UNIVERSITY OF MASSACHUSETTS, UNIVERSITY OF MASSACHUSETTS MEDICAL CENTER, HOWARD KOH, RALPH TIMPERI, Defendants, Appellees.
 No. 99-1100.
 United States Court of Appeals for the First Circuit.
 Heard June 7, 1999.
Decided July 14, 1999.
 
 APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTSKenneth P. McKay with whom Law Offices of K. Patrick McKay was on brief for appellant.
 Jane L. Willoughby, Assistant Attorney General, with whom Thomas F. Reilly, Attorney General, was on brief for appellees.
 Before Boudin, Circuit Judge, Campbell, Senior Circuit Judge, and Lipez, Circuit Judge.
 BOUDIN, Circuit Judge.
 
 
 1
 The present appeal arises out of a federal antitrust case dismissed by the district court on the ground that it was barred by the Eleventh Amendment. We assume to be true, for purposes of this appeal, the facts as alleged in the complaint. Duckworth v. Pratt & Whitney, Inc., 152 F.3d 1, 3 (1st Cir. 1998). However, the district court also considered, as do we, uncontroverted facts furnished by affidavit pertaining to the status of the defendants under the Eleventh Amendment.
 
 
 2
 The plaintiff-appellant in this case is Neo Gen Screening, Inc., a private, for-profit Pennsylvania corporation whose business is the medical screening of newborn children. In Massachusetts, as elsewhere, newborns must be tested for specified diseases, some of which can be remedied if promptly detected. Mass. Gen. Laws ch. 111, §§ 4E, 110A; see also id. §§ 3, 5, 6. According to the complaint, Neo Gen provides hospitals in various states with screening services to detect disorders in newborns but is being prevented by the defendants from doing so in Massachusetts.
 
 
 3
 The principal defendants named in the complaint as currently amended are the University of Massachusetts, a not-for-profit corporation linked to the state through governance and financing, its New England Newborn Screening Program ("the Screening Program"),[1] and two individuals--Howard Koh and Ralph Timperi--who are or were respectively the Commissioner of the Massachusetts Department of Public Health and an Assistant Commissioner responsible for laboratory testing. Several other defendants were named in the original complaint but later dismissed by consent.
 
 
 4
 The original complaint was filed on March 5, 1998, and contained eleven counts; but it was thereafter amended and reduced to two counts, the second of which was later voluntarily withdrawn. The remaining count (count I) is subcaptioned: "PLAINTIFF CORPORATION VS. DEFENDANTS NENSP AND UMASS VIOLATION OF THE SHERMAN ANTI-TRUST LAWS."; and it expressly charges the Screening Program and University of Massachusetts, in concert with the Massachusetts Department of Public Health, with monopolizing, attempting to monopolize and/or conspiring to monopolize "newborn screening services" in Massachusetts and surrounding states.
 
 
 5
 Although there are some collateral allegations, the main thrust of count I is an attack on the University of Massachusetts for seeking and obtaining a monopoly in the provision of the newborn screening services in Massachusetts. The only relief sought by the complaint is injunctive relief, apart from attorneys' fees, and the injunctive relief sought includes a request to bar the Commissioner and Assistant Commissioner from issuing permanent regulations that maintain the screening program's monopoly over the provision of the testing services in question. The complaint provides a history, which can be summarized briefly, as to how the supposed monopoly came about.
 
 
 6
 The Screening Program, a collection of personnel and a laboratory, had at one time been a unit of the Department of Public Health. At some point in the 1980s, the Screening Program was taken over by Tufts University and later, beginning in 1997, by the medical school of the University of Massachusetts. The Screening Program currently operates, under a contract between the University of Massachusetts and the Department of Public Health, to provide screening for specified disorders of newborn infants. A blood sample is taken by the hospital where the child is delivered and submitted to the Screening Program for testing, and a charge is paid by the hospital to the Screening Program.
 
 
 7
 In the fall of 1997, Neo Gen set about trying to persuade Massachusetts hospitals to let Neo Gen screen their newborns. It solicited hospitals in Massachusetts and purported to offer more modern, comprehensive screening at half the fee charged by the Screening Program. According to the complaint, the University of Massachusetts and its Screening Program responded by seeking adoption of regulations by the Department of Public Health that would give the Screening Program a monopoly in the provision of screening services in Massachusetts.
 
 
 8
 The complaint charges that the Screening Program "influenced" the Department of Public Health to issue emergency regulations that required testing for nine diseases and required that the blood samples be submitted to the Department itself. See 105 C.M.R. 270.000 et seq.. Also appended to the complaint is a contract entered into between the Department of Public Health and the University of Massachusetts requiring the latter to provide newborn screening laboratory work, clinical follow-up and research services. The proposed regulations were adopted on an emergency basis in November 1997, accompanied by statements that the Department of Public Health would thereafter study the possibility of allowing other entities to perform the screening.
 
 
 9
 The defendants moved to dismiss the amended complaint as barred by the Eleventh Amendment, asserting as well that the complaint failed to state a claim under the federal antitrust laws and was barred by various antitrust doctrines. In a decision issued on December 3, 1998, the district court held that the only claim remaining in the case was count I, that this count was directed against the University of Massachusetts and the Screening Program, and that both entities were arms of the state and were entitled to dismissal under the Eleventh Amendment. This appeal followed.
 
 
 10
 Under the Eleventh Amendment, a state or an arm of the state is normally immune from suits by citizens in federal court, Edelman v. Jordan, 415 U.S. 651, 662-63 (1974); see Chemerinsky, Federal Jurisdiction § 7.4, at 403 (3d ed. 1999), unless the state waives its immunity, Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 267 (1997), or Congress overrides that immunity as it may do in limited situations, Seminole Tribe v. Florida, 517 U.S. 44, 57-68 (1996). Neo Gen has not argued either that there was any waiver of Eleventh Amendment immunity by defendants or any abrogation of that immunity by Congress.
 
 
 11
 Whether and when state universities are arms of the state for Eleventh Amendment purposes have long vexed the federal courts. The multi-part tests that we have used are not easy to apply,[2] and, confusingly, overlap but do not quite duplicate tests that determine whether a university is an independent entity for purposes of diversity jurisdiction. Cf. University of Rhode Island v. A.W. Chesterton Co., 2 F.3d 1200, 1202-05 (1st Cir. 1993). A number of decisions have held that individual state universities are arms of the state for Eleventh Amendment purposes, but the inquiry tends to turn on facts peculiar to each university, and there are cases denying protection. See Chemerinsky, supra, § 7.4, at 407 & nn.33-34 (collecting cases).
 
 
 12
 In its decision under review, the district court explicitly found that the University in conducting the Screening Program was "acting as an agency or arm of the Commonwealth of Massachusetts." It rested this legal conclusion on a detailed discussion of the University's mission, its governance, its financial relationship to the state and similar matters. Its conclusion that the University is an arm of the Commonwealth accords with the view of another district court involving the University of Massachusetts. Daniel v. American Board of Emergency Medicine, 988 F. Supp. 127, 178-81 (W.D.N.Y. 1997).
 
 
 13
 On this appeal, Neo Gen has effectively failed to dispute the district court's holding that the University and its Screening Program are covered by the Eleventh Amendment. Since that ruling is at least colorable and certainly not plain error, cf. Beatty v. Michael Business Machines Corp., 172 F.3d 117, 121 (1st Cir. 1999), we treat the dismissal of the case against these two defendants as conceded. However, Neo Gen argues that Koh and Timpari were also intended defendants in count I and that despite the Eleventh Amendment these state officials are subject to injunctive relief under the doctrine of Ex Parte Young, 209 U.S. 123 (1908).
 
 
 14
 Ex Parte Young is one of several major qualifications on Eleventh Amendment immunity. Chemerinsky, supra, §§ 7.5-7.7, at 411-46. Ignoring some refinements, the doctrine removes the Eleventh Amendment bar where the private suit is directed not against the state or a state agency eo nomine but instead against state officials acting in violation of federal law and where (in addition) retrospective damages or property transfers are not sought for official acts. Coeur d'Alene Tribe, 521 U.S. at 269, 277-80; Strahan v. Coxe, 127 F.3d 155, 166-67 (1st Cir. 1997), cert. denied,--- U.S. ---, 119 S. Ct. 81 (1998); Chemerinsky, supra, at § 7.5, at 411-30. This exception is Neo Gen's main argument on this appeal.
 
 
 15
 The Commonwealth replies that the claims in count I were asserted only against the University of Massachusetts and the Screening Program and that no relief was sought under that count against the two named state officers. That is certainly what the district court thought, and its view is supported by the subcaption of the count (quoted above), which referred to those institutional defendants and no others. By contrast, count II, which was voluntarily withdrawn, specifically mentions Koh and Timperi as defendants in the corresponding subcaption.
 
 
 16
 Neo Gen counters that state officials were named as defendants in the complaint, that the Department of Public Health itself is mentioned in count I, that complaints are liberally construed, and that at worst it is entitled to leave to amend. The latter claim fails since leave to amend was not requested in the district court, but the construction of count I in its present form is open to reasonable dispute. We think that the injunctive relief against the two state officials is so clearly barred for a substantive reason that we prefer to affirm on that ground rather than because of a possible pleading error.
 
 
 17
 It is quite true that Ex Parte Young avoids the Eleventh Amendment defense where prospective injunctive relief, not involving damages or property transfer, is sought against named state officials for a violation of federal law. See Coeur d'Alene Tribe, 521 U.S. at 276-77. Usually, such injunctions are sought to require compliance with the Constitution; but the Ex Parte Young doctrine is equally applicable to compel state officials to comply with a valid federal statute that must be obeyed under the Supremacy Clause of the Constitution. Id. at 273-77. Thus, if the state officials were violating the Sherman Act, in principle the Eleventh Amendment would not bar injunctive relief against them.
 
 
 18
 The difficulty for Neo Gen is that it is clearly established that the Sherman Act does not itself apply to state action. In Parker v. Brown, 317 U.S. 341, 350-51 (1943), the Supreme Court determined that Congress had not meant to require states to comply with the Sherman Act. Accordingly, a state is free to regulate, or act on its own behalf, in ways that are anti-competitive and would not be permitted to a private individual. Id. This doctrine is so well settled that its rationale and underpinnings are scarcely worth discussing. See I Areeda & Hovenkamp, Antitrust Law, ¶¶ 221-222 (1997).
 
 
 19
 No doubt the emergency regulations, coupled with the ten-year renewable contract already described, create an effective monopoly for the University of Massachusetts in conducting the screening of Massachusetts newborns. By regulation, the blood must be made available to the Department, and the Department has chosen to contract with the University to do the testing. Although a hospital could also choose to engage Neo Gen, no hospital is likely to pay twice for the same service. But a regulation or purchase of services made by the state is classic state action immunized from the Sherman Act. Cf. Hoover v. Ronwin, 466 U.S. 558, 567-73 (1984); Tri-State Rubbish, Inc. v. Waste Management, Inc., 998 F.2d 1073, 1076 (1st Cir. 1993).
 
 
 20
 Neo Gen mistakenly attempts to distinguish Parker v. Brown and the long line of cases that have followed it by arguing that the Massachusetts legislature did not "clearly articulate" a purpose to supplant competition with monopoly. The cases on which Neo Gen relies, such as City of Columbia v. Omni Outdoor Advertising, Inc., 499 U.S. 365 (1991), and City of Lafayette v. Louisiana Power & Light Co., 435 U.S. 389 (1978), do impose a requirement of this kind (the details are not important here) where the acts sought to be shielded under Parker v. Brown are those of municipalities or other local public entities. But no such requirement exists where the acts are those of the state itself. Hoover, 466 U.S. at 568.
 
 
 21
 Whether executive branch action is that of the state is a different issue. The Supreme Court has held that acts of the state legislature or state supreme court are protected under Parker, but it reserved decision as to whether state-level executive branch departments or agencies are entitled to similar treatment. Hoover, 466 U.S. at 568 n.17 (reserving question). However, both circuits that have squarely faced the issue have extended Parker's ordinary protection to actions of the state executive branch.[3] We agree, with possible caveats that do not affect the outcome in this case.
 
 
 22
 Broadly speaking, the Parker doctrine represents a judgment by the Supreme Court that, in regulating anti-competitive business conduct, Congress was not seeking to regulate the states themselves; and "the states" include their executive branches quite as much as their legislatures and their courts. The municipalities have been given less protection under Parker on the stated ground that technically speaking, they are not "the state," Lafayette, 435 U.S. at 412-13, while the status of state boards or commissions is open to dispute, see Areeda, supra, ¶ 224; id. ¶ 212.2d at 141 & n.48 (1992 Supp.). And there is still less of an analogy to private carriers or utilities, operating under some measure of state supervision, whose protection under Parker is even more restricted. Southern Motor Carriers Rate Conference, Inc. v. United States, 471 U.S. 48, 57-62 (1985).
 
 
 23
 The question remains whether and to what extent a plaintiff should be able to pierce the Parker defense on the ground that the state official or agency was acting in excess of his (or its) authority under state law. On the one hand, the Supreme Court has made clear that the Eleventh Amendment is not to be avoided under Ex Parte Young merely in order to enforce state law. Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 106 (1984). On the other hand, extreme cases can be imagined: suppose a state executive official entered into an exclusive-dealing contract for the state that would violate the principles of Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320 (1961), if done by a private party, and suppose further that the state legislature had expressly banned such a contract.
 
 
 24
 We need not resolve such conundrums here. Neo Gen argues that the Massachusetts legislature did not expressly approve or authorize the kind of regulation or contract involved in this case; but we have rejected a "clear articulation" test as applied to the state's executive branch, at least where a full-fledged department is concerned. Given the Commonwealth statutes that authorize testing, there is nothing extraordinary or unforeseeable about the Department of Public Health's regulation requiring testing or its decision to do the testing itself or through a chosen instrument. Even if a patent lack of authority could ever be an exception to Parker, it is certainly not so in a case of this kind.
 
 
 25
 There are a scattering of other allegations in count I in addition to the charge that the University of Massachusetts sought and acquired a monopoly over newborn screening. These include claims that the "defendants" fixed the price of services at $42 per infant (whereas Neo Gen offered testing at $25), and that the defendants "influenc[ed]" the adoption of the regulations.[4] These undeveloped allegations are not pursued in Neo Gen's brief and deserve no further comment. King v. Town of Hanover, 116 F.3d 965, 970 (1st Cir. 1997).
 
 
 26
 It may be, as Neo Gen charges, that the defendants' actions reflect a cozy arrangement that gives newborns inferior screening at higher cost and that everyone--except possibly the Screening Program--would be better off if hospitals could contract competitively for screening services, just as they procure drugs, bandages, and other resources. The state, in turn, says that its contract provides for extra research and follow-up that Neo Gen fails to provide; such cross-subsidy arguments are traditional defenses for monopoly but not invariably without merit. At bottom, this is a policy matter to be resolved by the Commonwealth.
 
 
 27
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 Although named as a defendant, the Screening Program is simply a program at the University of Massachusetts conducted through its medical school, which is also not a separate corporation. However, given our disposition, we need not pursue our doubt whether the screening program is a suable entity.
 
 
 [2]
 E.g., Metcalf & Eddy, Inc. v. Puerto Rico Aqueduct & Sewer Authority, 991 F.2d 935, 939-40 (1st Cir. 1993) (7-factor test); In re San Juan DuPont Plaza Hotel Fire Litigation, 888 F.2d 940, 942 (1st Cir. 1989); Ainsworth Aristocrat Int'l Pty, Ltd. v. Tourism Co. of Puerto Rico, 818 F.2d 1034, 1038 & n.24 (1st Cir. 1987) (collecting cases).
 
 
 [3]
 Charley's Taxi Radio Dispatch Corp. v. Sida of Hawaii, Inc., 810 F.2d 869, 875-76 (9th Cir. 1987) (state department of transportation); Deak-Perera Hawaii, Inc. v. Department of Transportation, 745 F.2d 1281, 1282-83 (9th Cir. 1984) (same), cert. denied, 470 U.S. 1053 (1985)); Saenz v. University Interscholastic League, 487 F.2d 1026, 1027-28 (5th Cir. 1973) (division of University of Texas); compare Cine 42nd Street Theater Corp. v. Nederlander Org., Inc., 790 F.2d 1032, 1044-46 (2d Cir. 1986); see generally I Areeda & Hovenkamp, supra, ¶ 224b2, at 411-415; id. ¶ 212.2d (1992 Supp.).
 
 
 [4]
 But cf. Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 769 (1984) (coordination within a firm is not "price fixing" prohibited by the antitrust laws), and Eastern R.R. Pres. Conf. v. Noerr Motor Freight, 365 U.S. 127 (1961) (petitions to the government, if not mere "shams," do not give rise to antitrust liability).