**DATA RESEARCH CORP.,
et al., Plaintiffs,**

v.

**Cesar REY HERNANDEZ,
et al., Defendants.**

Civil Nos. 02–1253 (JAG), 02–1625(JAG), 02–1758(JAG).

United States District Court,
D. Puerto Rico.

April 30, 2003.

---

John F. Nevares, Smith & Nevares, San Juan, PR, Camilo K. Salas, Sessions, Fishman & Nathan LLP, New Orleans, LA, Arlene De–La–Matta–Melendez, Santurce, PR, Charles Bimbela, Fiddler, Gonzalez & Rodriguez, San Juan, PR, for plaintiff.

A.J. Bennazar–Zequeira, A.J. Bennazar Law Offices, Hato Rey, PR, Yvonne M. Menendez–Calero, Eduardo A. Vera–Ramirez, Landron & Vera LLP, Nestor J. Navas–D'Acosta, Reichard & Escalera, John F. Nevares, Leticia Acevedo–Crespo, Smith & Nevares, Miguel J. Rodriguez–Marxuach, Fernando J. Gierbolini–Gonzalez, Rodriguez Marxuach Law Offices, San Juan, PR, Jonathan T. Cain, Mintz, Levin, Coh, Ferris, Glovsky and Popeo PC, Reston, VA, for defendant.

## OPINION AND ORDER

GARCIA–GREGORY, District Judge.

On February 19, 2002, plaintiffs Data Research Corporation ("DRC"), its president and sole shareholder, Santos Diaz–Diaz ("Diaz"), Diaz's wife, Rosalina de la Matta, and the conjugal partnership formed by them (collectively, "plaintiffs"), filed suit against defendants Cesar Rey Hernandez ("Rey"), Puerto Rico's Secretary of Education; the Puerto Rico Department of Education ("DOE"); and other unnamed defendants. (Docket No. 1.) On April 18, 2002, plaintiffs filed an Amended Complaint that added Sila M. Calderon ("Calderon"), Puerto Rico's Governor, as a defendant. (Docket No. 8.) Plaintiffs contend, *inter alia,* that the defendants discriminated against them by canceling DRC's government contracts in retaliation for Diaz's exercise of his First Amendment rights.[1]

Also in 2002, plaintiffs filed two related cases involving alleged federal constitutional violations stemming from cancellations of their government contracts.[2] *See Data Research Corp. v. Calderon,* Civ. No. 02–1625(JAF); *Data Research Corp. v. Calderon,* Civ. No. 02–1758(HL). On June 6, 2002, Calderon moved to consolidate Case Nos. 02–1625(JAF) and 02–1758(HL) with this case. (Docket No. 26.) On June 11, 2002, the Court granted the motion. (Docket No. 34.) Case No. 02–1625 involves a dispute concerning DRC's contracts with the Puerto Rico Public Buildings Authority, and Case No. 02–1758 involves a dispute concerning DRC's contracts with the Puerto Rico State Insurance Fund. In both cases, as here, plaintiffs claim that the various defendants impermissibly cancelled DRC's contracts based on Diaz's political affiliation, in violation of plaintiffs' First Amendment rights.

On June 10, 2002, the Court issued an order granting defendants' request for oral argument on their motion to dismiss.[3]

---

1. Plaintiffs also brought other federal constitutional claims, as well as pendent claims under Puerto Rico law. *See* Docket No. 8. Shortly after filing their Amended Complaint, plaintiffs withdrew their equal protection, due process, and breach of contract claims. Additionally, plaintiffs appear to have abandoned their claim under section 253 of the federal Telecommunications Act, 47 U.S.C. § 253. In any event, as defendants correctly note in their motion to dismiss (Docket No. 32 at 19–20), section 253 does not apply in this case. Lastly, plaintiffs have withdrawn any claims relating to the January 18, 2001 contract referenced in the Amended Complaint. (Docket No. 8, ¶ 24.) Since plaintiffs have not pressed their analogous claims in the consolidated cases, the Court will dismiss them as well.

2. Plaintiffs filed Case No. 02–1625 on April 26, 2002. They filed Case No. 02–1758 on May 20, 2002.

3. The Court had previously scheduled a preliminary injunction hearing. (Docket No. 22.) Its order converted the preliminary injunction

(Docket No. 37.) The Court stated that it would rule on the motions to dismiss before considering plaintiffs' motion for preliminary injunctive relief. (*Id.*) The Court heard oral argument from the parties on June 12, 2002. Following consolidation, the Court allowed all parties in the consolidated cases to file supplemental . briefs. (Docket No. 44.)

On October 16, 2002, DRC moved to consolidate a fourth case, *Puerto Rico Telephone Company v. DRC Corporation*, Civ. No. 02–2497(RLA). (Docket No. 75.) The Court granted the motion on October 30, 2002. (Docket No. 77.) On November 1, 2002, third-party defendant Universal Service Administrative Company ("USAC") moved to oppose DRC's motion to consolidate, and shortly thereafter sought reconsideration of the Court's consolidation order. (Docket Nos. 79, 81.) On November 7, 2002, Puerto Rico Telephone Company ("PRTC"), the plaintiff in Civ. No. 02–2497, also moved the Court to reconsider its order consolidating the case, and sought to remand the case to the Puerto Rico Superior Court, San Juan Part. (Docket Nos. 82, 84.) In a separate Memorandum and Order issued contemporaneously with this Opinion and Order, the Court granted USAC's and PRTC's motions, thereby severing Civ. No. 02–2497 from three previously consolidated cases.

Pending before the Court are the various defendants' motions to dismiss under Fed.R.Civ.P. 12(b)(1) and 12(b)(6). (Docket Nos. 24, 27, 29, 32, 45, 47, 48, 50.) Also pending before the Court is plaintiffs' request for a preliminary injunction. (Docket No. 15.) Upon review of the record, the Court grants the motions in part and de-

nies them in part. Moreover, for the reasons set forth below, the Court denies the plaintiffs' request for a preliminary injunction.

## FACTUAL BACKGROUND[4]

DRC, a Puerto Rico corporation, is a leader in systems integration, providing quality and expert services for the development of networking infrastructures using the latest advancements of present and future technologies and their training required for their proper operation. Diaz is DRC's president and sole shareholder. He is a CPA and formerly a consultant with the international firm Peat, Marwick & Mitchell & Company. He has been previously recognized for. his efforts in designing, selling, and installing Microsoft products in the Caribbean. Diaz is affiliated with the New Progressive Party ("NPP"), a political party that advocates statehood for Puerto Rico. The NPP held political power in Puerto Rico from 1993 to 2000.

### *The DOE Complaint*

In 1983, Congress created the Universal Service System to make telephone service available to all Americans, regardless of geographic location, at a reasonable cost. In 1996, the Telecommunications Act revised the Universal Service System (commonly known as the E–Rate Program) by expanding both the base of companies that contributed to offset communications service rates and the category of customers who benefitted from discounts. One provision of the Telecommunications Act specifies that, upon request, individual commu-

---

hearing into an oral argument on the motions to dismiss. (Docket No. 37.)

4. The Court culls the facts, as it must at this stage, from the Amended Complaint in Civ. No. 02–1253 (Docket No. 8), from the Amend-

ed Complaint in Civ. No. 02–1625 (Docket No. 4), and from the Complaint in Civ. No. 02–1758 (Docket No. 1). *See Correa–Martinez v. Arrillaga–Belendez,* 903 F.2d 49, 51 (1st Cir.1990).

nications carriers must provide Internet service to schools and libraries at affordable rates. The total sum of the resulting discount is reimbursed by the E–Rate program. The Federal Communications Commission created the Universal Service Administrative Company ("USAC") to implement and administer the E–Rate Program. USAC, in turn, created the Schools and Libraries Division ("SLD").

During Phase I of the E–Rate Program, from July 1, 1998 to June 1, 1999, DRC and the Puerto Rico Telephone Company ("PRTC") submitted bids to the DOE in an effort to secure a contract for the construction of an internal connections infrastructure to deliver Internet services to public schools in Puerto Rico. DOE awarded the contract to DRC. As a result, DRC installed cabinets, patch panels, tubing, and wiring in several of the island's public schools. On or about March 26, 1999, DRC submitted a proposal to the DOE to provide Internet access and other related services to 760 of DOE's public schools. On September 28, 1999, the SLD approved approximately $19.5 million in funding for Internet-related services to be provided by DRC.

Phase II of the E–Rate Program, from July 1, 1999 to June 30, 2000, commenced with the construction of the infrastructure to provide Internet services. DRC subcontracted PRTC to construct and operate the infrastructure (or transport system) for approximately 760 public schools. For Phase III of the E Rate Program, from July 1, 2000 to June 30, 2001, DRC submitted a proposal to DOE to be the Internet Service Provider ("ISP") for approximately 760 public schools. On September 20, 2000, USAC accepted DRC's proposal and approved funding for $45.6 million for that purpose.

On November 14, 2000, DOE and DRC signed a contract for the provision of In-

ternet-related services (the "Agreement"). The Agreement called for DOE to pay DRC $45.6 million for Internet and other services that DRC agreed to provide to Puerto Rico's public schools. The Agreement further specified that DRC would provide Internet service for one year, with an optional renewal term of three years, provided that E–Rate funding remained available. The Agreement could be cancelled in one of three ways: (1) by mutual consent; (2) by DOE, after providing DRC with 30 days written notice prior to cancellation; or (3) by DOE, without prior notice, but only for negligence, non-compliance with the terms of the Agreement, or improper conduct by DRC. The parties amended the Agreement on December 13, 2000. The amendment reduced the amount to be paid to DRC for services rendered (to $43.3 million), and extended the length of the contract period from one to four years, through June 30, 2004, subject to the availability of E–Rate funds. DRC complied with the terms of the Agreement and received 90% of the compensation it earned as of June 30, 2001.

In the fourth year of the E–Rate program, running from July 1, 2001 to June 30, 2002, USAC and DOE notified DRC that it had been selected as the Internet service provider for approximately 760 public schools. USAC's October 26, 2001 letter specified that it had approved funding in the amount of $22.8 million.

### The Grand Jury Indictment

On January 23, 2002, a federal grand jury returned a criminal indictment against several contractors who conducted business with the DOE. Although neither DRC nor Diaz were included in the indictment, their names had been mentioned in the media as potential targets of the federal criminal investigation into the DOE. The next day, on January 24, 2002, Calderon called a press conference to announce, *in-*

*ter alia,* that she had ordered the immediate cancellation of all government contracts awarded to DOE contractors who had been either indicted or mentioned in the media as potential criminal targets. In addition, Calderon ordered the cancellation of all government contracts held by persons or entities affiliated with the previous administration, particularly the members of a group of businesspeople publicly affiliated with the previous administration.

On January 23, 2002, the day on which the grand jury returned the indictment, Rey sent a letter to DRC cancelling the Agreement. The letter offered no reason for the cancellation. On February 15, 2002, Rey wrote a second letter to DRC. The letter stated that the DOE had cancelled the Agreement "for reasons of healthy public administration" (in Spanish, "por razones de sana administración pública"), pursuant to Section Twelve of the Agreement.

Plaintiffs contend that Rey has embarked on a campaign to persecute Diaz because of his political affiliation to the NPP. Moreover, they argue that Rey impermissibly demanded that Diaz provide "added values" under the E-Rate Program. Diaz rejected Rey's entreaties, arguing that the proposed "added values" constituted illegal conduct and could be regarded as a kickback.

Sometime after January, 2002, the DOE re-bid the contract for the fifth year of the E-Rate Program (from July 1, 2002 to June 30, 2003) and awarded the contract to PRTC. DRC's bid was $9 million lower than PRTC's. Plaintiffs allege that Rey improperly interfered with the bidding process to thwart DRC's bid.

*The PBA Complaint*[5]

On or about 1998, the PBA became concerned about certain government regulations that required agencies to become Y2K compliant by the Year 2000. Because the PBA's information systems were woefully outdated at the time, the agency declared a state of emergency and authorized its Information Systems Office to issue a request for proposals ("RFP") to develop a Y2K solution for its information systems. The PBA thereafter issued an RFP in accordance with its regulations. DRC submitted a proposal, pursuant to the RFP, to provide the requested services, and the PBA's Bid Board approved it. On November 10, 1998, the PBA and DRC entered into a Professional Services Contract (the "Contract") to provide services, installations and materials to ensure that the PBA became Y2K compliant.

According to the Contract, DRC was required to complete the project by October 31, 2000. The Contract provided, however, that DRC would be entitled to receive extensions of time in the event of delays attributable to PBA or to third parties. Accordingly, in September 1999, the parties agreed to extend the terms of the Contract for a period of no less than seven months. Sometime thereafter, the parties further extended the terms of the Contract and, as a corollary, their relationship. On November 21, 2001, pursuant to PBA's request, DRC submitted an integrated work plan detailing the work needed to conclude DRC's obligations under the Contract.

In December 2001, as noted earlier, DRC's name was mentioned in the local media as a potential target of a federal criminal investigation. Also on January 24, 2002, Calderon informed that she ordered the immediate cancellation of all

---

5. In this case, Civ. No. 02–1625, plaintiffs brought suit against Calderon, Lillian Rivera– Correa ("Rivera–Correa"), the Executive Director of the PBA, and the PBA.

government contracts awarded to DOE contractors who had been indicted or mentioned in the media.

On March 20, 2002, Rivera–Correa, on PBA's behalf, declared DRC to be in default of the Contract. She thereafter asked the Puerto Rican–American Insurance Company to execute on the performance bond that DRC had posted. DRC argues that it was entitled to remedy or correct any alleged deficiencies prior to cancellation, and contends that Rivera–Correa's actions came about as a result of Calderon's orders to cancel all contracts held by DOE contractors with ties to the previous administration. Additionally, DRC contends that the cancellation of the Contract was the culmination of an extended "process of negotiations" during which PBA prevented DRC from completing its work. Plaintiffs claim that since June, 2001, the PBA gave it "excuse after excuse" to prevent it from completing its work on the project. Plaintiffs maintain that the PBA caused the intentional delays to discriminate against DRC because of its political affiliation with the NPP.

### The SIF Complaint [6]

On September 29, 1999, the SIF and DRC signed a contract for the acquisition and implementation of information systems for hospitals and clinics. Since September, 2001, however, SIF did not allow DRC to finalize its work and intentionally delayed DRC's efforts to comply with its obligations under the contract. DRC completed work totaling over $760,000 that SIF certified as completed but for which it has yet to pay DRC. Following the grand jury indictment, the SIF cancelled the Contract on March 14, 2002.

### DISCUSSION

#### A. *Motion to Dismiss Standard*

Under Fed.R.Civ.P. 12(b)(6), a complaint may not be dismissed unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *See Brown v. Hot, Sexy, and Safer Prods., Inc.*, 68 F.3d 525, 530 (1st Cir.1995). The Court accepts all well-pleaded factual allegations as true, and draws all reasonable inferences in plaintiff's favor. *See Correa–Martinez v. Arrillaga–Belendez*, 903 F.2d 49, 51 (1st Cir.1990). The Court need not credit, however, "bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like" when evaluating the Complaint's allegations. *Aulson v. Blanchard*, 83 F.3d 1, 3 (1st Cir.1996). When opposing a Rule 12(b)(6) motion, "a plaintiff cannot expect a trial court to do his homework for him." *McCoy v. Massachusetts Institute of Tech.*, 950 F.2d 13, 22 (1st Cir.1991). Plaintiffs are responsible for putting their best foot forward in an effort to present a legal theory that will support their claim. *Id.* at 23 (*citing Correa–Martinez*, 903 F.2d at 52). Plaintiffs must set forth "factual allegations, either direct or inferential, regarding each material element necessary to sustain recovery under some actionable theory." *Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 514 (1st Cir.1988).

As noted *supra*, plaintiffs streamlined their case considerably following oral argument. There are essentially three claims pending before the Court: (1) for damages, pursuant to 42 U.S.C. § 1983, for constitutional violations pursuant to the First Amendment; (2) for damages, pursuant to Article 1802 of the Puerto Rico Civil

---

6. In this case, Civ. No. 02–1758, plaintiffs brought suit against Calderon, Nicolas Lopez Peña ("Lopez"), in his personal and official capacities as Manager of the Puerto Rico State Insurance Fund, and the SIF.

Code, 31 P.R. Laws Ann. § 5141;[7] and (3) for preliminary injunctive relief (namely, reinstatement of the cancelled government contracts). The Court will first examine the defendants' jurisdictional arguments and affirmative defenses. Should the claims survive, the Court will then determine whether they meet the standard outlined in Fed.R.Civ.P. 12(b)(6).

## B. *Eleventh Amendment*

### a. *DOE and the Eleventh Amendment*

 Defendants argue, and plaintiffs concede, that the DOE is an arm of the Commonwealth and is therefore entitled to Eleventh Amendment immunity.[8] The DOE is therefore immune from suit in federal court, and the Court will grant its motion to dismiss on Eleventh Amendment grounds.[9] *See Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993); *Vicenty–Martell v. Estado Libre Asociado De Puerto Rico*, 48 F.Supp.2d 81, 92 & n. 7 (D.P.R.1999).

Also in the DOE case, defendants argue (with respect to defendant Calderon) that she is entitled to Eleventh Amendment immunity in her official capacity because she lacks the statutory authority to perform the acts requested of her. The Governor of Puerto Rico, defendants maintain, is not the Commonwealth officer with the authority to perform the acts that would be required in the event the Court were to issue an injunction in plaintiffs' favor. *See* Docket No. 32 at 14. That statutory authority, they further contend, is vested on the Puerto Rico Secretary of Education. *See* 3 P.R. Laws. Ann. §§ 396(13), (14). The Court agrees. Because she remains as a defendant in her personal and official capacities in at least one other consolidated case, however, the Court will not dismiss her from the case.

### b. *PBA and the Eleventh Amendment*

Defendants contend that the PBA, like the DOE, is entitled to Eleventh Amendment immunity. In doing so, defendants argue that the recent opinion issued by this Court in *Iravedra v. Public Building Auth.*, 196 F.Supp.2d 104 (D.P.R.2002) (Dominguez, D.J.) was wrongly decided. In *Iravedra*, the Court concluded, after conducting an exhaustive analysis of the agency's enabling statute, that the PBA was not an "alter ego" of the Commonwealth, and was therefore not entitled to Eleventh Amendment immunity. *See Id.* at 106–115.

Defendants' argument with respect to the Court's decision in *Iravedra* is two-pronged. First, defendants disagree with the Court's conclusion that the PBA, and not the Commonwealth, will respond in the event of an adverse judgment.[10] Regretta-

---

**7.** Since there has been no developed argumentation regarding this claim, the Court will not address it at this time.

**8.** The Commonwealth of Puerto Rico is treated as a state for *Eleventh Amendment* immunity purposes. *Puerto Rico Ports Auth. v. M/V Manhattan Prince*, 897 F.2d 1, 9 (1st Cir. 1990).

**9.** The parties also appear to agree that the SIF is not entitled to Eleventh Amendment immunity. *See, e.g.*, Docket No. 47 at 2. Defendants in the SIF case do not expressly concede the point, but offer no developed argumentation suggesting that the SIF is somehow entitled to Eleventh Amendment immunity.

**10.** Defendants contend that "the mere capacity to sue and be sued has been held not to be a determinative factor in deciding whether an entity is an arm of the state" for Eleventh Amendment purposes. *See* Docket No. 47 at 10. But defendants cite no case law or other authority in support of their position. More importantly, the *Iravedra* Court did not regard this factor as "determinative," but rather as one of several that, when examined together, tipped the balance in favor of a finding that

bly, defendants' contention that the Commonwealth "in all likelihood" would respond in the event of an adverse judgment against the PBA—and even then, not just any adverse judgment, but one that "imperiled the PBA's fiscal viability"—is supported by no factual or legal authority. This is particularly unfortunate because determining whether the Commonwealth will stand behind PBA's debts is a critically important issue in the arm-of-the-state analysis. As the First Circuit recently noted, "when there is an ambiguity about the direction in which the structural analysis points, the potential payment from the state treasury is the most critical factor in determining whether an entity is operating as an arm of the state." *See Fresenius Medical Care Cardiovascular Res., Inc. v. Puerto Rico and Caribbean Cardiovascular Center Corp.*, 322 F.3d 56, 66 (1st Cir.2003).

In *Fresenius,* the First Circuit explained that the arm-of-the-state analysis involves "two key questions, with many factors instructive on each," namely:

A. Has the state clearly structured the entity to share its sovereignty?

B. If the factors assessed in analyzing the structure point in different directions, then the dispositive question concerns the risk that the damages will be paid from the public treasury.

"This analysis focuses on whether the state has legally or practically obligated itself to pay the entity's indebtedness." *Id.* at 68. "If the expenditures of the enterprise exceed receipts, is the State in fact obligated to bear and pay the resulting indebtedness of the enterprise? When the answer is 'No'—both legally and practically—then

the Eleventh Amendment's core concern is not implicated." *Hess v. Port Auth. Trans–Hudson Corp.*, 513 U.S. 30, 51, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994). The Court must look at "what is said by state law on the topic and *what in fact has happened.*" *Fresenius,* 322 F.3d at 72 (emphasis supplied). Because there is no developed evidentiary record on that score, the Court finds itself unable to answer the latter question.

The PBA's second argument centers on section 907a of its enabling statute, 22 P.R. Laws Ann. § 907a, by which the Commonwealth guarantees payment of principal and interest on certain outstanding bonds (as specified by the PBA). *See Fresenius,* 322 F.3d at 73 ("It is noteworthy that the Commonwealth is not a guarantor on the bonds."). As to these bonds, the statute pledges the Commonwealth's good faith and credit to ensure payment. *See Royal Caribbean v. Puerto Rico Ports Auth.*, 973 F.2d 8, 11 (1st Cir.1992)(noting that the fact that the Ports Authority, and not the Commonwealth, is liable for the principal and interest of its own bonds as evidence of operational autonomy); *Fresenius,* 322 F.3d at 69 (noting that the statutory language declaring that the Commonwealth is responsible for an agency's debts suggests that it is an arm of the state). The Court's opinion in *Iravedra* did not examine this statutory section, nor did it indicate whether the parties in that case had submitted evidence regarding the degree of fiscal autonomy enjoyed by the PBA. *See University of R.I. v. A.W. Chesterton Co.*, 2 F.3d 1200, 1213 (1st Cir.1993)(noting that Eleventh Amendment immunity challenges may require fact-intensive inquiries).

The Court has no evidence before it to determine the actual degree of fiscal and

the PBA was not an alter ego of the Commonwealth. *See* 196 F.Supp.2d at 111 (identifying "substantial autonomy" over an agency's

internal operations as the most important element in the Court's analysis).

operational autonomy that the PBA enjoys. *See Royal Caribbean,* 973 F.2d at 11 (comparing the relative degrees of fiscal autonomy enjoyed by various governmental entities to determine the Ports Authority's entitlement to Eleventh Amendment immunity). Given that the multi-factor test employed to determine if an agency is an arm of the state is "not easy to apply," *Neo Gen Screening, Inc. v. New England Newborn Screening Program,* 187 F.3d 24, 27 (1st Cir.1999), the Court cannot reach a definitive conclusion on the arm-of-the-state question without the benefit of a developed record. *See Fresenius,* at 75 (discussing evidence on the issue submitted before the district court). Accordingly, the Court will provide the parties with a limited discovery period on this issue, comprised of 30 calendar days from the date of this Opinion and Order. The parties will then have 10 working days after that date to submit simultaneous briefs on the issue. The Court will then ascertain whether the PBA satisfies the arm-of-the-state test.

### c. Retroactive and Prospective Equitable Relief

The parties disagree on the extent to which the Court's potential decision to reinstate the cancelled government contracts at issue here would be retroactive or prospective in nature. Given that the question involves application of the Eleventh Amendment, the Court will discuss it here.

■ First, the Court will not allow the retroactive reinstatement of the contracts (even if plaintiffs ultimately prevail), as the Eleventh Amendment expressly bars that

remedy.[11] *See Edelman v. Jordan,* 415 U.S. 651, 667–69, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). Plaintiffs point to *Neo Gen Screening, Inc. v. New England Newborn Screening,* 187 F.3d 24 (1st Cir.1999), and argue that the case law supports their view that the Court can enjoin defendants and order them to reinstate the cancelled contracts retroactively. *See* Docket No. 41 at 10, 11. The Court disagrees. The claim that the Court may award retrospective injunctive relief because the majority of the E Rate funds come from the federal government is unavailing. *See, e.g., Fernandez v. Chardon,* 681 F.2d 42, 59–60 (1st Cir.1982)(noting that when a state accepts federal funds it does not waive its sovereign immunity, particularly so where "state and federal funds are intermingled").

Should plaintiffs prevail, the Court may, following trial, decide to order the prospective reinstatement of the contracts to prevent an ongoing violation of federal law. *Green v. Mansour,* 474 U.S. 64, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985). The Court has discretion to order such a remedy, although, as in the public employment cases, plaintiffs' lack of a protected property interest in the cancelled government contracts could be a pivotal factor in the Court's analysis.[12] *See, e.g., Rosario–Torres v. Hernandez–Colon,* 889 F.2d 314, 320–24 (1st Cir.1989).

### C. The Forum Selection Clauses

■ Defendants in the PBA and SIF cases contend that the Court should dismiss plaintiffs' claims against them because their contracts with DRC contain

---

**11.** The Court declines to hold that reinstatement is exclusively a retroactive remedy. *See* Docket No. 42 at 3–4,

**12.** The remaining individual defendants sued in their official capacities shall remain in the suit because they remain subject to the possi-

ble remedy of prospective injunctive relief to redress a continuing violation of federal law. *See Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *Green,* 474 U.S. 64, 106 S.Ct. 423, 88 L.Ed.2d 371.

forum selection clauses that require plaintiffs to bring suit before the Puerto Rico state courts. Plaintiffs, on the other hand, argue that the forum selection clauses at issue here are permissive, not mandatory, and therefore allow the Court to entertain their claims. *See Action Corp. v. Toshiba Am. Consumer Prods.*, 975 F.Supp. 170, 176 (D.P.R.1997)(explaining the distinction between mandatory and permissive forum selection clauses). The Court will review each clause in turn.[13]

a. *The DRC–PBA Contract*

■ The DRC–PBA forum selection clause states, in pertinent part: "DRC agree and submits to the jurisdiction of the courts of the Commonwealth of Puerto Rico and agrees that the venue for any legal proceedings lies in San Juan, Puerto Rico." (Docket No. 48, Exh. 1, § 10.2) Plaintiffs' argument is twofold: first, they contend that the forum selection clause merely confers jurisdiction affirmatively, and does not preclude them from using the federal court as a potential forum for their claims. Second, they contend that even if the clause did provide for exclusive jurisdiction, its language does not prevent them from filing in the Puerto Rico-based United States District Court.

The language of the forum selection clause contained in the PBA–DRC contract is identical, in all significant respects, to the language of the forum selection clause

at issue in *Autoridad de Energia Electrica v. Ericsson*, 201 F.3d 15, 18 (1st Cir.2000). In *Ericsson*, the forum selection clause read as follows:

This contract will be governed and interpreted pursuant to the Laws of the Commonwealth of Puerto Rico and the parties agree to submit to the jurisdiction of the courts of the Commonwealth of Puerto Rico.

The First Circuit held that the clause was "an affirmative conferral of personal jurisdiction by consent, and not a negative exclusion of jurisdiction in other courts." *Ericsson*, 201 F.3d at 19 (citing cases); *see also Jet Wine & Spirits, Inc. v. Bacardi & Co., Ltd.*, 298 F.3d 1, 12 (1st Cir.2002)(noting that "[c]ontractual language consenting to the jurisdiction of one forum ... is not the same as language specifying one forum and excluding all others"); *Redondo Constr. Corp. v. Banco Exterior de España, S.A.*, 11 F.3d 3 (1st Cir.1993).

The Court will interpret the PBA–DRC forum selection clause in similar fashion. The forum selection clause affirmatively confers jurisdiction on "the courts of the Commonwealth of Puerto Rico," but does not contain specific language of exclusion. PBA "could easily have drafted the contract to provide for exclusive jurisdiction in the Commonwealth courts if that were its intent," *Ericsson*, 201 F.3d at 19, but it did not do so. The Court therefore declines

---

**13.** In reviewing the forum selection clauses, the Court follows the well-established First Circuit rule that "contract-related tort claims involving the same operative facts as a parallel claim for breach of contract should be heard in the forum selected by the contracting parties," should the parties so select. *Lambert v. Kysar*, 983 F.2d 1110, 1121–22 (1st Cir.1993). The circuit courts have held that a contractually-based forum selection clause will encompass tort claims if the tort claims "ultimately depend on the existence of a contractual relationship" between the parties,

*Coastal Steel Corp. v. Tilghman Wheelabrator, Ltd.*, 709 F.2d 190, 203 (3d Cir.1983), or if "resolution of the claims relates to interpretation of the contract," *Manetti–Farrow v. Gucci Am., Inc.*, 858 F.2d 509, 514 n. 5 (9th Cir. 1988), or if, as noted above, the tort claims involve the same operative facts as a parallel breach of contract claim, *Lambert*, 983 F.2d at 1121–22. Here, plaintiffs have dismissed their breach of contract claims, but their constitutional tort claims involve the same operative facts.

PBA's invitation to accord the clause a more restrictive reading, and concludes that the forum selection clause in the PBA–DRC contract is permissive. As a result, plaintiffs are entitled to bring their claims in federal court.[14]

### b. *The DRC–SIF Contract*

■ The forum selection clause in the DRC–SIF contract states, in pertinent part: "[DRC] accepts to submit exclusively to the competence and jurisdiction of the Tribunal Superior in its San Juan section, in case that any claim or controversy arises as a result of this CONTRACT." (Docket No. 56 at 23.) They contend that the forum selection clause is permissive, since it does not "expressly indicate that the stipulated forum is the only tribunal that may hear a claim." *Action Corp.*, 975 F.Supp. at 176. The Court disagrees.

A review of the DRC–SIF contract's forum selection clause shows that it contains specific exclusionary language that distinguishes it from the DRC–PBA contract. Indeed, the DRC–SIF contract expressly states that DRC agrees to submit itself *exclusively* to the Puerto Rico Superior Court's "competence and jurisdiction" in the event that "any claim or controversy" arises out of the agreement. "A mandatory clause is a contractual provision whereby parties agree to a preselected forum and assign that forum exclusive jurisdiction over all disputes arising out of the contract." *Action Corp.*, 975 F.Supp. at 176. The specific language of exclusion contained in the forum selection clause persuades the Court that the clause is *prima facie* valid, mandatory, and should be enforced "unless enforcement is shown by the resisting party to be 'unreasonable'

under the circumstances." *Silva v. Encyclopedia Britannica Inc.*, 239 F.3d 385, 386 (1st Cir.2001)(citing *M/S Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 10, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972)).

Here, the parties signed a contract that provided for the exclusive jurisdiction of the Puerto Rico Superior Court. The wording of the clause expresses the parties' intention to make that court the exclusive forum for "any claim or controversy" arising out of the contract. *Silva*, 239 F.3d at 389; *see Zapata*, 407 U.S. at 2, 92 S.Ct. 1907. Since the clause is mandatory, the Court will enforce it unless "enforcement would be unreasonable and unjust, or . . . the clause [is] invalid for such reasons as fraud or overreaching." *Zapata*, 407 U.S. at 15, 92 S.Ct. 1907; *see also Miro Gonzalez v. Avatar Realty, Inc.*, 177 F.Supp.2d 101, 104 (D.P.R.2001)(noting that when the parties agree to a forum selection clause, the resisting party must show the unreasonableness of enforcement under the circumstances).

Plaintiffs do not seriously dispute that they freely entered into the contract, and have not proffered any evidence that might lead the Court to conclude otherwise. They argue, for example, that the forum selection clause binds only them, but that argument does not help their cause. Even if that were the case, plaintiffs knowingly brought their claims in a forum other than the one which they agreed would be the exclusive forum for "any claim or controversy" arising out of the contract. Accordingly, the Court holds that the forum selection clause in the DRC–SIF contract is mandatory. Plaintiffs' claims arising out of that contract must be brought before the Puerto Rico Superior Court.

---

**14.** DRC argued, in the alternative, that the forum selection clause's language did not preclude it from filing suit in this Court, which is geographically located in the Commonwealth of Puerto Rico. *See Action Corp.*, 975 F.Supp. at 175. Given its ruling, the Court need not reach that issue.

### D. *The First Amendment Claims*

Plaintiffs principally allege that this case concerns defendants' discriminatory decision to cancel their government contracts in retaliation for their exercise of their First Amendment rights. *See, e.g.,* Docket No. 41 at 2–3. Defendants, on the other hand, contend that plaintiffs' claims are garden-variety breach of contract claims that they have tried to bootstrap into federal court by casting them as putative § 1983 claims. *See, e.g.,* Docket No. 32 at 1; Docket No. 48 at 3. Moreover, defendants maintain that even if the Court did not regard them as thinly-disguised breach of contract claims, the First Amendment claims would still fail because they do not meet the heightened pleading standard set forth in *Judge v. City of Lowell,* 160 F.3d 67, 72 (1st Cir.1998).[15] *See* Docket No. 32 at 16.

#### a. *Heightened Pleading Requirement*

In *Judge,* the First Circuit held that, in civil rights cases alleging constitutional violations that call for proof of improper motive, the plaintiff must plead the element of improper motive "by alleging specific non-conclusory facts from which such a motive may reasonably be inferred, [and] not merely by generalized assertion alone." *Judge,* 160 F.3d at 72 (citing *Correa–Martinez,* 903 F.2d at 51).

Last year, the United States Supreme Court decided *Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). Although that case dealt specifically with heightened pleading requirements in the context of a Title VII discrimination claim, the Court noted that "complaints in these cases, as in most others, must satisfy only the simple requirements of [Fed.R.Civ.P.] 8(a)."[16] *Swierkiewicz,* 534 U.S. at 513, 122 S.Ct. 992. The First Circuit has not yet had occasion to state whether *Judge* remains good law in light of *Swierkiewicz.* At least one district court in this Circuit has held that *Swierkiewicz* effectively abrogated the heightened pleading requirement set forth in *Judge. See Greenier v. Pace, Local No. 1188,* 201 F.Supp.2d 172, 176–77 (D.Me. 2002). The *Greenier* Court held that *Swierkiewicz* "reminded lower courts that, in order to survive a motion to dismiss, [plaintiffs] need only satisfy the simple requirements of Rule 8(a)." 201 F.Supp.2d at 176. Because the district court was "unable to reconcile pre-existing First Circuit precedent with the Supreme Court's ruling in an intervening case," it decided to follow *Swierkiewicz.*[17] *Id.* at 177 (citing *Stewart v. Dutra Constr. Co.,* 230 F.3d 461, 467 (1st Cir.2000)).

Several other Circuits have held that there is no heightened pleading require-

---

**15.** Defendants point to the case of *Rivera–Diaz v. PRTC,* 724 F.Supp. 1069 (D.P.R.1989), to argue that the plaintiffs' claims are "disguised" breach of contract claims. *See, e.g.,* Docket No. 51 at 15. That case, however, was decided before the United States Supreme Court's decision *O'Hare Truck Serv., Inc. v. City of Northlake,* 518 U.S. 712, 116 S.Ct. 2353, 135 L.Ed.2d 874 (1996), which dealt specifically with a First Amendment claim brought by an independent government contractor pursuant to § 1983.

**16.** The other cases the Court specifically mentioned as not subject to the 8(a) requirement

were suits subject to the pleading-with-particularity requirement under Fed.R.Civ.P. 9(b). *See* 534 U.S. at 513 n. 3, 122 S.Ct. 992.

**17.** Accordingly, the *Greenier* court reviewed the plaintiff's Complaint "guided not by the narrow question of whether it contains facts that, if true, could satisfy *every element* of an employment discrimination claim, but rather by the broader question whether the Complaint contains enough information to put Defendant on notice of the nature of Plaintiff's claim." *Id.* (italics in original).

ment in cases other than those governed by Rule 9(b). *See Galbraith v. County of Santa Clara,* 307 F.3d 1119, 1125 (9th Cir.2002)(noting that *Swierkiewicz* dispelled "any remaining doubt on the continued validity of a heightened pleading requirement of improper motive in constitutional tort cases"); *Higgs v. Carver,* 286 F.3d 437, 439 (7th Cir.2002)(reading *Swierkiewicz* to mean that "[a] complaint that complies with the federal rules of civil procedure cannot be dismissed on the ground that it is conclusory or fails to allege facts"); *Harbury v. Deutch,* 233 F.3d 596, 610 (D.C.Cir.2000), *rev'd on other grounds sub nom. Christopher v. Harbury,* 536 U.S. 403, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002); *Trulock v. Freeh,* 275 F.3d 391, 405 (4th Cir.2001); *Currier v. Doran,* 242 F.3d 905, 916 (10th Cir.2001).

Defendants argue that *Judge* still controls, even in light of *Swierkiewicz,* because *Swierkiewicz* was a Title VII case that did not involve the qualified immunity defense.[18] Neither *Swierkiewicz* nor *Greenier* were § 1983 cases, and therefore did not address that particular question. Although the cases cited above do call into question the continued validity of *Judge's* heightened pleading requirement, the Court is reluctant to conclude that *Swierkiewicz* abrogated *Judge* in the absence of specific guidance from the First Circuit on the issue. *See, e.g., Judge,* 160 F.3d at 77 (upholding the First Circuit's heightened pleading requirement in § 1983 cases requiring proof of improper motive in light of an intervening decision from the United States Supreme Court). Accordingly, the Court will treat *Judge's* heightened pleading requirement as controlling when evaluating plaintiffs' First Amendment claims.

### b. *The Substantive Claims*

■ It is well-established that the First Amendment forbids the government from cancelling government contracts held by an independent contractor in retaliation for the contractor's exercise of his First Amendment rights. *See O'Hare Truck Serv., Inc. v. City of Northlake,* 518 U.S. 712, 116 S.Ct. 2353, 135 L.Ed.2d 874 (1996); *El Dia v. Rossello,* 165 F.3d 106 (1st Cir.1999). Plaintiffs' First Amendment claim—which, they emphasize, is "the fundamental constitutional question presented by these cases"—actually appears to be two separate claims. Each must be analyzed independently.

The first claim involves retaliation based on political affiliation. In essence, plaintiffs contend that in late January, 2002, following reports of a federal criminal investigation at the DOE and a subsequent grand jury indictment stemming therefrom, Calderon ordered the cancellation of several government contracts held by various DOE contractors who had been publicly affiliated with the previous administration (and had been identified as such in the media), because of their affiliation with the opposition political party. The cancellations, plaintiffs further contend, were carried out for pretextual reasons, bearing no actual relation to plaintiffs' performance, and in violation of the contracts' express terms. These allegations suffice to survive a motion to dismiss, especially in light of *O'Hare,* because the Amended Complaint contains allegations from which a reasonable jury could infer—at least circumstantially—that defendants acted with an improper motive. Because the plaintiffs should not have to

---

**18.** The individual defendants here have pleaded qualified immunity as an affirmative defense, but, in the context of plaintiffs' First Amendment claim, have not actually sought dismissal based on qualified immunity. Rather, they have moved to dismiss based on plaintiffs' alleged failure to satisfy *Judge's* heightened pleading requirement.

allege more facts to survive a motion to dismiss than they would need to allege and support to survive a motion for summary judgment, district courts must accept as specific, nonconclusory allegations of fact those allegations that provide circumstantial evidence of improper intent. *Goad v. Mitchell,* 297 F.3d 497, 505 (6th Cir.2002)(citing *Trulock,* 275 F.3d at 405); *see also Judge,* 160 F.3d at 77.

The second claim, a freedom of expression claim, is substantially less straightforward. This claim alleges that Rey "embarked in a campaign" to persecute Diaz politically, "to the point of demanding that [Diaz] provide added values under the E Rate Program." (Docket No. 8, ¶ 27.) Although plaintiffs state that this conduct was "clearly evident during the year 2001," they do not explain what specific actions evinced defendants' intent to discriminate against them based on their speech. To illustrate, in their opposition to defendants' motions to dismiss, plaintiffs argue that defendants violated the First Amendment by cancelling their government contracts "solely because the contractor, who is affiliated with and is an active member of a political party that opposes the current government, complained of matters of serious public concern, *such as certain added values demanded by at least one government official.*" (Docket No. 56 at 3.) Even if taken at face value, these allegations refer exclusively to defendants' alleged actions (specifically Rey's) in the DOE case, and not the companion cases. They do not explain how the allegedly protected expressive activities in one case apply in the context of the other cases.

Given the uncertainty over the continued viability of *Judge,* however, the Court will not dismiss the latter First Amendment claim (as noted earlier, the first claim survives, at this stage, under either standard). The Court will allow plaintiffs to file a Second Amended Complaint, no later than 20 calendar days from the date of this Opinion and Order, that sets forth their First Amendment allegations with respect to this particular claim in specific detail.[19] Defendants will then have the opportunity to seek dismissal (as to that claim) should they believe that the allegations still fail to comport with *Judge's* heightened pleading requirement.

**E. *Preliminary Injunctive Relief***

Lastly, the Court will address plaintiffs' motion for a preliminary injunction. In an earlier order, the Court indicated that it would first rule on the motions to dismiss before ruling on plaintiffs' request for preliminary injunctive relief. After doing so, and upon review of the parties' submissions, the Court denies plaintiffs' request.

■ The principal claim presently before the Court is one for First Amendment violations stemming from an allegedly retaliatory contract cancellation. Plaintiffs have conceded, as they must, that they have no property interest in the government contracts. The presence of a protected property interest in the cancelled government contracts is one of the key factors examined when considering reinstatement. *Rosario–Torres v. Hernandez–Colon,* 889 F.2d 314, 323 (1st Cir. 1989). Given these circumstances, the Court is unwilling to consider reinstatement at this preliminary stage. The Court therefore denies the motion for a preliminary injunction, and declines to grant the extraordinary equitable remedy (reinstatement prior to trial) sought by plaintiffs.

19. This ruling, in effect, is analogous to the grant of a motion for a more definite state- ment under Fed.R.Civ.P. 12(e).

The Court hastens to add that even if plaintiffs ultimately prevail at trial, they would not be automatically entitled to have their contracts reinstated. As the First Circuit has noted, a finding of a First Amendment violation (in the public employment context) does not lead inexorably to reinstatement. Moreover, the Court has expressly recognized that the application of that remedy lies solely within the Court's discretion. *See, e.g., Velazquez v. Figueroa–Gomez,* 996 F.2d 425, 428 (1st Cir.1993).

### CONCLUSION

For the foregoing reasons, the Court **grants** defendant DOE's motion to dismiss on Eleventh Amendment grounds. Partial judgment dismissing DOE will enter accordingly. the parties shall have **30 calendar days** from the date of this Opinion and Order to conduct discovery concerning defendant PBA's entitlement to Eleventh Amendment immunity. The parties shall file simultaneous briefs on the issue **10 working days** after the expiration of the discovery period.

The Court **denies** the defendants' motion to dismiss the PBA case on forum selection grounds. The Court **grants** the motion to dismiss the SIF case on forum selection grounds. Judgment will enter accordingly.

The Court **denies** the defendants' motion to dismiss the First Amendment claim based on political affiliation. The Court grants plaintiffs a period of **20 calendar days** from the date of this Opinion and Order to submit a Second Amended Complaint with specific factual allegations concerning their freedom of expression claim.

IT IS SO ORDERED.